## THE SUN FIRE OFFICE v. WICH.

| 6 | 103 |
| 8 | 411 |

| 6 | 103 |
| 36S | 219 |

**1. IMMATERIAL ERROR.**

If it be error to introduce in evidence the policy upon which the action was brought without the application upon which it was issued, and without calling upon the defendant to produce it, the error is waived by the defendant by putting the application in evidence.

**2. INSURANCE—APPLICATION.**

When the policy refers to the application or other papers connected with the risk and adopts them as part of the contract of insurance, all the statements of the assured contained therein relative to the

situation, use, care or character of the property, are warranties on
his part.   The assured is not relieved from the consequences of a
false statement by the fact that he signed the application at the
suggestion of the solicitor, and did not know what it contained.

3. INSTRUCTIONS—PRACTICE.

Questions upon which there is no evidence should not be submitted to
the jury.

4. INSURANCE—TRANSFER.

It seems that a transfer between partners is not a breach of the condi-
tion in a policy against transfers.

*Appeal from the District Court of Arapahoe County.*

IN DECEMBER, 1888, appellee, Voght, Ell and Hess, pur-
chased a brewery at Florence from one McCandless, together
with appliances, for the sum of $12,150, $4,000 of which
was paid in cash.   The remaining $8,150 was secured by the
joint notes of the four purchasers, and a mortgage upon the
property.   The conveyance from McCandless was made to
the four purchasers.   The four then formed a partnership to
prosecute the business of brewing, and carried on such busi-
ness under the name of " The Arkansas Valley Brewing
Co." About February 1, 1889, one Carleton, an insurance
solicitor for Perkins, Hart & Co., of Denver, applied to ap-
pellee to insure the property ;—was sent by him to examine
it.   After making such examination, he reported that he
would insure it to the amount of $15,000, to which appellee
agreed.   A blank application was filled up by Carleton, and
executed by appellee, " The Arkansas Valley Brewing Co.,
by John Wich (owner)."

The firm of Perkins, Hart & Co., finding they could not
write the entire $15,000 in companies represented by them,
so informed appellee, and secured $1,530 of the amount in
the office of appellant through its agents, Packard, Wilson
& Piper.   The former application and data were submitted
to the last named company.   The application being in some
respects unsatisfactory, a second one was filled up by some
agent or representative of the insurers, and executed by
appellee the same as the former.

The four partners continued the business until about the 15th of August, 1889, when Ell, Voght and Hess drew out, conveyed their interests by quitclaim deed to appellee, and the partnership was dissolved, appellee paying nothing for their interests, but assuming notes and mortgage made to McCandless. From that time appellee prosecuted the business some twenty-six days, until the night of September 5th, when buildings, appliances, etc., were destroyed by fire.

Appellant refused to pay the $1,530 written by it upon the property, and appellee brought suit. Trial was had to a jury, resulting in a verdict and judgment for the plaintiff (appellee) for the sum of $1,617.22, from which an appeal was prosecuted.

The remaining facts necessary to an understanding of the case, it is hoped, will appear in the opinion.

Mr. Cʜᴀs. J. Hᴜɢʜᴇs, Jʀ., and Mr. Tʏsᴏɴ S. Dɪɴᴇs, for appellant.

Mr. Cʜᴀs. M. Bɪᴄᴇ and Mr. S. D. Wᴀʟʟɪɴɢ, for appellee.

Rᴇᴇᴅ, J., delivered the opinion of the court.

There are in this case sixty-one errors assigned, many of which are purely technical, and are not discussed in argument. Some few are presented and discussed at considerable length. Without considering the mass of errors assigned, or the most of them, sufficient remains to raise the important and fundamental questions that must determine the case. Before proceeding to those, I will briefly dispose of the first.

The application for insurance and the policy of insurance remained separate and distinct papers. At the time of the trial they had not been attached, the application remaining in the hands of the company, while the policy was in the possession of insured. The plaintiff (appellee) put the policy in evidence without the application, and without calling upon the defendant to produce it. This is urged as error. The·

application upon which the defendant alleged the policy was issued was set out in the answer in *hœc verba;* was by the defendant put in evidence upon the trial.

In *Lycoming Mu. Ins. Co. v. Sailer,* 67 Pa. St. 108, the same error was assigned. The court held: "But this error, if it was one, did the defendants no harm. They afterwards produced and gave in evidence the application, and they have had on trial all the advantage of that document." Such was the case here. Although, perhaps, a technical error, the defendant could not have been prejudiced by it. Hence the contention is without valid force. The application in question was the basis of the defense. All the important questions presented grow out of it.

Before proceeding to the consideration of the other questions involved, it may be well to refer to *Wich v. Equitable Ins. Co.,* 2 Colo. App. 484, in which counsel for appellee say: "This court has already considered and adjudicated the main features of the present controversy, so far, at least, as concerns the right of the plaintiff to go to the jury upon the fact presented in his case in chief." The cases are in some respects identical,—the same plaintiff, the same property, and the same loss,—but there are one or two important questions involved in the present case that were absent in that. By reference to that case it will be seen that at the close of the plaintiff's evidence a motion for nonsuit was made and sustained.

It was held erroneous; that the issues made by the pleadings were, many of them, of fact, which were clearly within the province of the jury, and that the parties were legally entitled to have the questions determined by the jury.

In this case no such question is presented. It was tried to a jury, and no important question raised in this was determined in that; consequently, no adjudication of any question involved. The questions presented for determination are: *First.* Carleton being a soliciting agent of Perkins, Hart & Co., and appellant making the insurance at the solicitation and at the instance of Perkins, Hart & Co., to what extent

did appellant adopt his agency, and to what extent is appellant bound by his acts? *Second.* Were the statements made by Carleton and Shreeve, and by them reduced to writing in the application upon which the policy was issued, and executed by appellee, warranties upon the part of appellee, which would vitiate the contract of insurance if the statements were untrue? These two questions, the second involving two or more propositions, seem conclusive of the case.

There is probably no branch of jurisprudence so confused by judicial decision in courts of greatest merit as the questions presented. At the very outset, the investigator plunges into an impenetrable fog. Many courts, regarding the provisions of policies of insurance as onerous and preventing the insured from securing the benefits of his contract, have as far as possible departed from the rules of construction adopted in other contracts, and waived in favor of the insured contract obligations which would have been enforced in other transactions; while other courts, of equal reputation, have attempted to construe the contract of insurance the same as other contracts, and held the insured responsible for his own acts, unless the contract was, in its inception, so affected by fraud as would avoid other contracts.

Appellant, having taken the risk at the instance and request of Perkins, Hart & Co., and upon data furnished by them, obtained through their agent Carleton, may be regarded, to that extent, as having adopted the acts of such agent, and as being bound by them to the same extent that Perkins, Hart & Co. would be. But this is no solution of the question presented, for the question then presented is, how far Perkins, Hart & Co. were bound by his acts and representations.

It is conceded that Carleton was a special or soliciting agent to obtain contracts of insurance, without power to issue policies or conclude contracts, who could only report his doings and findings to his superiors, who at their own election accepted or rejected the proposal.

That class of agents, clothed by their superiors with some

*indicia* of authority to act for the company, are anomalous in business transactions,—sent out as solicitors to secure business, receiving their compensation by commission upon the business secured.   It is apparent that they are by their principals placed in a position to perpetrate a double fraud : *First*, upon their employer by excessive insurance ; *second*, upon the insured by garbled or manufactured statements of the value and condition of the property, for the purpose of securing the commissions, the obtaining of which depends upon the completion of the contract, and the amount of such compensation upon the amount of insurance.   The insured is required to make and sign an application which of necessity preceded the issuing of the policy.   After viewing the premises, the application is filled by the solicitor.   To secure compensation, the values and conditions are overestimated and erroneously stated.   The insured, having no knowledge of its legal effect upon the insurance to be effected, executes it ; is perhaps told that " it is only a matter of form," necessary to secure the insurance, in other respects unimportant. The company, by its policy, protects itself against the fraud, but the insured has no protection.

It has been held by many respectable courts, and frequently urged in argument, that the agent, in the appraisal of the property and filling up of the application, was not the agent of the insurer, but the agent of the insured, who was responsible for his misrepresentations, when in fact, if the agent of either, it must of necessity have been that of his employer, who had given him the power to act in its behalf, and whose interests should have been guarded by the agent.   The truth is that a person occupying such a hybrid, amphibious position is not the agent of either, but working for himself, regardless of the interests of both.   Against his fraudulent acts the company, which has placed it in his power to defraud others, is amply protected, while the insured, who gives him credit as an agent, has no protection whatever.   The whole system · of representation by solicitors is vicious, and should be abrogated by legislation or otherwise, and the principals made

responsible for the acts of the agents within the *seeming* and apparent limits of their authority.

The law, under the circumstances of this case, makes it obligatory upon the party dealing with an agent to ascertain the extent of the authority conferred. If he fails to do so, it is at his own peril.

On February 4, 1889, the insurance was effected. The following paragraph appears in the body of the policy: "If an application, survey, plan, statement, or description of the property hereby insured is referred to in this policy, such application, survey, plan, statement, or description shall be considered a part of this contract, and to be a warranty by the insured, whether the same be written by the insured or by some other person; and this policy shall become void in the event of any false representation by the insured of the condition, situation or occupancy of the property, or of any omission to make known any facts material to the risk, or of any other valuation or any misrepresentation whatsoever, either in a written statement or otherwise. And the society shall not be bound under this policy by any act of or statement made to or by any agent or other person, which is not authorized by this policy, or contained therein or in any written paper above mentioned."

It appears the firm of Perkins, Hart & Co. had previously insured the same property, through the solicitor Carleton, for about $11,000. Soon after the purchase by appellee and his associates, Carleton again applied to insure it. The evidence shows he personally made an examination, and estimated the value of the property; informed Wich he could put $15,000 on it; filled the application himself, and Wich executed it. Perkins, Hart & Co. could only take of the $15,000 $13,470, and obtained the balance, $1,530, through the office of Packard, Wilson & Piper, which is the matter in controversy. The application to Perkins, Hart & Co., as made by Carleton, was presented to agents of appellant by the other firm, but being unsatisfactory in some respects, a new one was required. Here occurs a peculiar conflict in

evidence in regard to the person who wrote and secured the second application, delivered the policy, and collected the premium. Wich testified that it was Carleton, and that he had never seen Shreeve until he saw him in court during the trial. Shreeve testified that he was a member of the firm of Packard & Co.; that he called upon Wich with the Carleton application, and required another; and that *he* filled up the application, executed by Wich, upon which the policy in this case was issued. It appears to have been a case of mistaken identity, and that the Carleton application was the basis of the second application, which was only changed in some particulars and secured by Shreeve.

It is contended upon the part of appellee that the application, being detached and not specially referred to in the policy, is not a part of the contract. It is true that in the reference to the application its date is omitted, but it is not shown that the application need be dated. It was in this instance, but the date was not inserted in the reference attached to the policy. Such omission is unimportant when the instrument is put in evidence and identified by both parties, nor is it necessary that the paper be attached. Contracts are frequently evidenced by two, three, or more individual papers, the relevancy and connection being established by parol proof, in the absence of which the attaching of the papers would not establish their identity.

A principal contention by counsel of appellee is that by reason of the acts and participation of the agent and Shreeve in getting up the application it is not the act of nor obligatory upon the appellee; in fact, that there was no such contract as is evidenced by the papers. Many authorities are cited that are supposed to sustain that position, the first being *State Ins. Co. v. Taylor*, 14 Colo. 499. A slight examination of that case will show that there was no application signed by the insured. It was made, signed and delivered by the agent, and the insured had no knowledge of or connection with it; hence there was no contract, and nothing con-

tained in the pretended application was obligatory upon the insured.

Very many courts of great respectability have as far as possible relieved applicants from the full effect of statements made in the application. The "iron clad" provisions of policies issued, together with the manner of securing insurance through irresponsible agents, for whose acts the employer ignores all responsibility, have compelled courts to carry the law to the extremest possible limit to guard the rights of the insured and afford him indemnity. Consequently, many authorities may be found seemingly sustaining the contention of counsel; but a careful examination of them shows not one going to the extent of shielding the applicant in this case from responsibility under the circumstances as shown.

There is no claim that appellee was uneducated and illiterate,—the reverse appears from his own evidence,—nor was there any attempt to show fraud or imposition in obtaining the paper. True, the paper was filled by the other party. It was unimportant who did the clerical work. It was executed and adopted by appellee. If he failed, as he testifies, to read it, his failure to do so cannot be imputed to the other party. Immediately above the signature of appellee, at the bottom of the application, printed in clear type, appears the following : " The applicant hereby covenants and agrees to and with the said company, that the foregoing is a just, full and true exposure of all the facts and circumstances in regard to the property heretofore mentioned, and said answers and representations are considered the basis on which insurance is to be effected, and the same is understood as incorporated in and forming a part of the policy, and further covenants and agrees that if the situation or circumstances are changed, or risk increased, or property become incumbered in any manner or way, during the term of any policy or policies of insurance of this company insuring the said property, will notify the agent of this company forthwith of such alteration, increase of risk or incumbrance, and hereby declare and

acknowledge that this is the act and statement of the owner of said property, and warranty on part of assured whether the answers have been written by the applicant in person or not."

It was impossible that appellee could have executed the paper without seeing it. If he failed to read it, he should suffer the consequences of his own negligence. No man can shield himself from the obligation of a contract he has executed by a willful or negligent refusal to read the paper he signs.

The theory upon which courts proceed in allowing the acts of the agent to be put in evidence to avoid the seeming contract is, in effect, that the supposed warranties of the insured in the application were put in by fraud on the part of the agent; that the insured did not participate; hence there was no contract; and in all cases when the circumstances will warrant, holding the principal responsible for the acts of the agent, by estoppel. This seems a plausible evasion of the rule that verbal testimony is not admissible to vary a written contract.

The courts most strongly sustaining the contention of appellee are those of Iowa, Indiana and Minnesota. In the former state, where the decisions are extreme, they are founded upon a statute of that state holding the company to greater responsibility of the acts of the soliciting agent. None others go to the extent supposed by counsel. Among those cited and relied upon there are some which, under the circumstances of this case, maintain the opposite doctrine; notably, *Life Ins. Co. v. Rogers*, 119 Ill. 474; *Rogers v. Ins. Co.*, 121 Ind. 570; *Pickel v. Ins. Co.*, 119 Ind. 291.

Until there is legislation curing the vicious course of insurance through the employment of solicitors, whose acts are repudiated by their employers, it is far safer, while protecting the insured as far as possible against the frauds of the agent, to hold cases of the character of the one under consideration as contracts where, as in other contracts, each party is responsible for his own acts and undertakings. In

1 May on Insurance, sec. 138, *et seq.*, the questions here presented are elaborately discussed, but the statements of different conclusions from different courts are so confusing and conflicting as to be of slight aid to the examiner, until section 144*g* is reached, where the following clear and logical conclusion is stated : " There being no usage or special evidence to the contrary, *the very fact that his signature to the paper is required is notice to him that the company does not rely upon the agent, but requires the applicant's own authority.*" Under the circumstances and the employment of solicitors, it is safe and proper to hold that the agent, in writing the answers of the applicant, is not doing the work of the company but of the applicant, and that the company are no more responsible for it than if done by a stranger. A solicitor working for commissions comes nearer being a broker than an agent. Their interests are often adverse to the company, making false statements to secure commissions ; nor can the assured avoid responsibility by neglecting to read the paper, when by so doing the misstatements could have been corrected. In the same section of May on Insurance (sec. 144*g*) it is said: " It seems clear that if (the insurer) is honest and fair, it should not be held for an omission or error of a really substantial nature, whether made by the insured, or by the agent, through mistake or otherwise, in filling up an application from his answers, *and which the assured might have discovered if he had taken the trouble to read the statement he signed.*"

There is no reason, in contracts of insurance, that a party should be, by law, relieved from the duty of exercising the same ordinary care and prudence that is required in every other business transaction. It is the duty of every man to read what he signs. His failure to do so will or should not relieve him, or allow him to avoid the contract.

In *New York L. Ins. Co. v. Fletcher*, 117 U. S. 519, the agent set down false answers, and the applicant signed the application without reading it. The policy issued upon it was conditioned that the answers were part of it, and that

*no statement to the agent not thus transmitted should be binding on the principal.* These conditions, conspicuously printed upon it, accompanied the policy. The policy was held void. The court said: " It was the duty of the applicant to read the application he signed. He knew that upon it the policy would be issued if at all. It would introduce great confusion in all business transactions, if a party making written proposals for a contract, with representations to induce its execution, could be allowed to show, after it had been obtained, that he did not know the contents of his proposals, and to enforce it, notwithstanding their falsity as to matters essential to its obligation and validity. Contracts could not be made, or business fairly conducted, if such a rule should prevail." See *Lewis v. Ins. Co.*, 39 Conn. 100 ; *Ryan v. Ins. Co.*, 41 Conn. 168 ; *Richardson v. Ins. Co.*, 46 Me. 394.

In 1 Wood on Insurance, sec. 150, it is said: " When the policy refers to the application or other papers connected with the risk, and adopts them as part of the contract of insurance, all the statements of the assured contained therein relative to the situation, use, care, or character of the property are warranties on his part, and must be strictly complied with, whether material to the risk or not."

In *Marshall v. Ins. Co.*, 27 N. H. 157, it is said: " The application in such cases must truly represent the risk, and must be true in all respects, whether material or not."

In New York the same conclusions as above are stated as the law. See *First Nat. Bank v. Ins. Co.*, 50 N. Y. 47; *Leroy v. Ins. Co.*, 39 N. Y. 91, also 45 N. Y. 80; *Ripley v. Ins. Co.*, 39 N. Y. 136. See, also, *Garcelon v. Hampden Co.*, 50 Me. 580 ; *Battles v. York Ins. Co.*, 41 Me. 208 ; *Kelsey v. Ins. Co.*, 35 Conn. 225 ; *Gahagan v. Ins. Co.*, 43 N. H. 176·; *Tebbetts v. Ins. Co.*, 1 Allen (Mass.), 305 ; *Draper v. Ins. Co.*, 2 Allen, 569 ; *Brown v. Ins. Co.*, 11 Cush. (Mass.) 280·; *Bersche v. Ins. Co.*, 31 Mo. 555 ; *Edwards v. Ins. Co.*, 74 Ill. 84.

That such has been the line of decision in England, see *Newcastle etc. Co. v. Macmorran*, 3 Dow, 255 ; *Bufe v. Tasner*, 2 Marsh. 46 ; *Britton v. Royal Ins. Co.*, 4 Foster & F.

905; *Macdonald v. Fire etc. Ins. Co.*, 8 Q. B. 328; *Thompson v. Weems*, 9 App. Cas. 671.

The testimony clearly establishes the fact that the title to the property was misstated to the insurers, the deed having been made by the grantor, McCandless, to appellee, Herman Ell, Gottlieb Hess, and Paul Voght. There was no such corporation or association as The Arkansas Brewing Company to take title. 2d. That in the application appellee stated the value of the insured property to be $25,000, and such application contains the following clause : " The value of the property being fixed and warranted by applicant; "—when in fact the greatest valuation warrantable, including betterments made by the owners, was less than $14,000, some $1,500 of which was not covered by insurance, showing overvaluation of 100 per cent, and insurance exceeding the entire value nearly $2,500.

W. H. Runkle, the agent who purchased the property for Wich and others, testified in regard to its value, at the time of purchase, December 12, 1888, as follows : "I made the investigation, and found that the building and real estate, machinery, fixtures, barn, and all other property, personal or real, belonging to said company, could be bought for $12,500;"—and he bought it at that price. After the purchase he, as agent, expended in improvements and for necessary articles $1,026.95, making the whole amount $13,876.95.

Appellee testified: "I lost $15,000 by the fire. * * * I made improvements to the extent of about $1,600. * * * (Runkle, the agent, made it $1,126.95.) The $15,000 I spoke about represents the amount *paid in running the brewery.* The total amount I paid out of my pocket I do not know, *as it was a losing business.*" He also testified that the notes of McCandless for the purchase of the property had not been paid at the time of the trial. According to the testimony of appellee and Runkle, it will be seen that the verdict and judgment not only covered the full value of the property, but the losses sustained in carrying on the business.

3d. By a provision in the policy, it was to become void in case there was any change of title, unless the fact was communicated to the company. About the 15th of August the other parties conveyed their interests to appellee, and he became sole owner. The fact was not communicated. The property was destroyed by fire September 5th.

In the application appellee stated the business *was profitable*. That it never had been profitable was shown by the testimony of appellee and others. It was also shown that business was suspended for a long time, and there had been no watchman, the reason being that the men were driven away by the ghost of some poor fellow that chose the place for the purpose of suicide.

The instructions given by the court, 1 to 7, both inclusive, are correct statements of the law, with the exception that in the second and third the court said : " If you find him (John Wich) the legal or *equitable* owner of the property," etc.

There was no evidence whatever of equitable ownership. The title as shown was purely legal ; vested, first, in the four, and later in appellee, as sole owner. To submit the question of equitable ownership was error.

The ninth instruction is correct,—a clear statement of the law of the case. The 8th, 10th and 11th were faulty, and at variance with others given, allowing the jury to relieve the appellee from the force or effect of his contract if they found he signed it at the suggestion of the solicitor, and did not know what it contained, etc. The 14th was particularly faulty, in effect allowing the jury to find the entire title in appellee by virtue of some alleged verbal arrangement, whereby their title was to fail in the future, on failure to pay their respective shares of the purchase.

The judgment will be reversed, and cause remanded for a new trial.

*Reversed.*

ON REHEARING.

PER CURIAM. The property covered by the policy on which this suit is based was insured in other companies for

various sums.   One of the policies was the subject-matter of
another suit, which came to this court by appeal, and is
reported in 2 Colo. App., p. 484.   The apparent diversity in
the opinion of the court in the two cases has been made the
subject of much argument.   Counsel also urged with appar-
ent sincerity and unusual insistence two propositions which
we regard as of vital consequence in the settlement of the
issues.   These things have moved the court to a practical
reconsideration of the case, and have led us to supplement
the principal opinion.   To make the present discussion plain,
a little fuller statement must be made of some of the elements
of the case.   The brewery property was bought on the 20th
of December, 1888, from one James McCandless.   The con-
sideration was $12,150, of which $4,000 was paid in cash, and
the balance by the notes of the purchasers.   The abstract
does not show how many notes were executed, nor the time
for which they ran.   They were made by John Wich, Her-
man Ell, Gottlieb Hess and Paul Voght.   The cash was
paid by Wich.   There is evidence tending to show that the
proportionate interests of the respective parties were to be
two fifths to Wich, and one fifth to each of the others.   No
cash was paid save by Wich.   What, if at all, the others
were of necessity to contribute, otherwise than as to these
proportionate interests, is not clear.   Some of the parties tes-
tified the contributions were to be in these stated proportions,
while Wich says each was to put up $3,000, and to advance
it within two months.   There must be some mistake about
this, because a contribution of $9,000 by the other three
would be a larger sum than they were bound to pay, accord-
ing to the testimony of the copartners.   However this may
be, the testimony is not as definite as it ought to be concern-
ing the terms of the agreement.   If these parties went in
together to buy the brewery and run.it on some antecedently
settled plan, which is highly probable, they ought to be and
probably are able to state the exact terms of the agreement,
both in respect to the amount to be contributed by each, the
time within which it was to be paid, and the conditions which

were annexed to the contract.   Counsel complain that in the *Equitable Company's Case,* in the 2 Colo. App., the court took a totally different view of the contract from the one now arrived at.   The reason for this is very plain.   The point on which that case turned respected the alleged equitable title of Wich.   It was there insisted, as it is here, that, notwithstanding the apparent interest of Hess, Ell, and Voght, in reality the title was in Wich, who was the equitable owner of all the property, and therefore had an insurable interest to the extent of its entire value, and consequently there had been no breach of one of the conditions, to wit, that respecting the sole and unconditional ownership.   There was some attempt to establish this on the former hearing, but the plaintiffs were nonsuited on the theory that there had been a breach of this condition.   This court held this specific issue should, under the testimony, have been submitted to the jury.

The court did not go farther than to decide this narrow question.   We have examined the abstract in that case, and it contains nothing to indicate the real facts concerning the title as they are stated in the present record.   It is manifest that on the 20th of December, 1888, whatever may have been the agreement between the copartners respecting the conditions on which the purchase was made, as they are at present disclosed, they acquired an undivided interest in the property by the deed from McCandless.   Wich's contribution of the cash in no wise affected the legal rights of the other copartners.   In legal effect, they paid a part of the consideration money when they executed their notes for the unpaid portion of the purchase price and delivered them to the grantor.   They became invested with both a legal and an equitable interest in the property.   They proved no sort of an agreement *inter se* which would leave Wich the holder of the entire equitable interest and the other three with none. It was not established that the other three were to pay the totality of their part of the purchase price, regardless of the notes, before they should be invested with an interest in the property.   As between themselves, the copartners could only

be called upon to advance their proportionate share of the capital paid for the conveyance and of what might be put in to start the business. Wich alone testifies that this contribution was to be paid within two months, or the nonpaying members were to have no interest. His evidence on this subject is not satisfactory, and is not in harmony with that of his copartners. They all agree they went into the enterprise, and were to advance their proportionate part of the necessary money, or else were to forfeit their claim. It appears to us that the tenor and exact terms of this condition ought to be shown. Any failure in this particular would resolve the legal question on which the plaintiff predicates his right to maintain the action against him. We are not prepared to differ with counsel when he maintains that if the entire equitable interest was held by Wich, he might, if there were no other legal obstacles, recover on the policy, on the hypothesis that it is unnecessary for him to hold the legal title in order to have an insurable interest to the extent of the value of the property. A very great difficulty arises from the absence of evidence tending to show that the liability of the other three on the notes was contingent on the completion of the agreement and the payment by them of what was advanced by Wich when the property was bought. The notes are still held by McCandless, and the parties can be made to pay. What their rights may be as between themselves and Wich, and whether, on the surrender, he made an agreement which would entitle them to protection by him against the paper, is not made clear by the testimony. In any event, there was no novation whereby these three parties would be released, and Wich alone holden on the notes. The absence of the legal title would be no obstacle to his recovery. If the other three persons could be adjudged the holders of what may be termed a " dry trust," this would not lessen his insurable interest. The difficulty springs from the circumstance that when these four parties entered into an agreement which virtually made them copartners, and bought the property, and executed their notes for the purchase price,

they became invested with both a legal and an equitable interest, which entirely destroys the claim that Wich's title was an equitable one to the whole property. This statement is based on the theory that Wich failed to prove any such agreement between himself and his copartners as would leave him the holder of the entire equitable title. If he is able to satisfy the jury that the copartners made an agreement sufficiently specific, exact and certain in its terms as to exclude the legal inferences which must be necessarily drawn from the facts of the purchase and the execution of the commercial paper which was subsequently carried out by the transfer in May by the three to Wich, he may possibly bring his case within the doctrine concerning the insurability of equitable titles. The case in this particular must be submitted to the jury with apt instructions on this subject, otherwise the general verdict cannot be accepted as conclusive on this question.

There are two other matters which it may not be inexpedient to comment on somewhat more extensively than was deemed necessary by the court when the original opinion was prepared. The appellant places much reliance on the transfer in May by Voght, Ell and Hess to Wich, as a breach of the condition in the policy against transfers. A good many states do not regard transfers between partners as a breach of this condition in a policy. *Va. Fire & Marine Ins. Co. v. Vaughan*, 88 Va. 832; *Texas B. & I. Co. v. Cohen*, 47 Tex. 406; *N. O. Ins. A. v. Holberg et al.*, 64 Miss. 51; *West et al. v. Citizens' Ins. Co.*, 27 Ohio St. 1; *Pierce v. The Nashua Fire Ins. Co.*, 50 N. H. 297; *Dermani v. Home Mutual Ins. Co.*, 26 La. Ann. 69; *Burnett & Martin v. Eufaula Home Ins. Co.*, 46 Ala. 11; *Powers et al. v. Guardian Ins. Co.*, 136 Mass. 108; *Hoffman & Place v. Ætna Fire Ins. Co.*, 32 N. Y. 405.

We should therefore be inclined to hold the deed executed in May not a breach of that condition. The case would thus turn on proof respecting the original agreement. When this matter is thus brought into the forefront of the case, and the jury are aptly instructed respecting it, the question may be definitely settled by their verdict.

The other difficulty respects the valuation of the property. In turn, this again hinges on another matter of fact, on which there is much conflict in the evidence. The company contends that the policy is void because of the overvaluation of the property. The witnesses were not in harmony on this matter of value. It is not of necessity true that the purchase price of real or personal property is of much weight in the settlement of such a dispute. The circumstances of the seller and the purchaser, and the wants or necessities of either, enter largely into the question of price. The purchasers who were called as experts and the witnesses produced by Wich were not agreed as to the value of either the buildings or the property. The special verdict of the jury does not enable us to decide between them, or to harmonize the differences in the evidence. Many special questions were submitted to the jury, and their answers would lead us to question the estimates of the owners. We do not care to express any pronounced opinion concerning it, since another jury will be called on to settle this fact. The importance of this may be wholly destroyed if the subsequent jury should decide one other matter in the plaintiff's favor. Before the present policy was issued by the Sun Fire Office Company, the usual application for insurance was presented to Wich for his signature. The case discloses the fact of the preparation of two applications. On this, and the settlement of the facts respecting it, the whole matter of truthful or overvaluation hinges. The circumstances surrounding the preparation of the application are irreconcilable, and this matter must be determined by the jury. The instruction with reference to it should be direct and specific. Wich contends that the application which was pleaded by the Insurance Company, and offered in evidence, was not his. His testimony tends to show that he signed the first application, which was followed by the delivery of the present policy, with probably some others. Likewise, the presentation to him of another application thereafter, and his execution of it at the request of the agent, without any knowledge what-

ever of its contents. The company's testimony tends to show a refusal to issue a policy on the first application, and the preparation of the second in Wich's presence, and on the basis of information furnished by him, followed by his subsequent signature. Of course, if the jury finds these facts with the company, it would end the controversy respecting the matter of the valuation, for this would demonstrate the untruthful and misleading character of Wich's statements regarding it. A party must place a fair and reasonably. truthful valuation on the property which he seeks to insure when the statements made in his application are agreed to be warranties as between him and the company. A departure from this rule will make the contract of insurance void.

We make our statements very general in this regard, so that they may not be unduly operative in the ensuing trial.

We think what has been said sufficiently responds to counsel's contentions on the application for a rehearing, and will be sufficient to enable the trial court to dispose of the case without much trouble.

We still conclude the judgment must be reversed and the case remanded for a new trial.