LULU M. LEWIS, Respondent, v. NEW YORK LIFE
INSURANCE COMPANY, Appellant.

Kansas City Court of Appeals, February 17, 1919.

1. **LIFE INSURANCE:** False Representations: Colorado Statutes.
Plaintiff's husband, while a resident of Colorado, applied for and
was issued an insurance policy providing for monthly payments
to his wife after his death. In his application he made statements
which the evidence conclusively shows were false. It was *held*
that the policy was a Colorado contract, not affected by the pro-
visions of section 6937, Revised Statutes 1909, to the effect that
misrepresentations in obtaining a policy shall not render it
void unless they contributed to the event on which the policy is
due and as the evidence discloses conclusively that the insured
failed to make full, complete and true answers concerning his

previous health and the physicians consulted, the defendant had a right to rescind the contract.

2. ———: ———: Specific Inquiry: Laws of Colorado. A misrepresentation, in a contract of life insurance, material to the risk, made in response to a specific inquiry, upon which an obligor relies to his injury, voids the policy at the option of the latter, under the laws of Colorado.

Appeal from Jackson Circuit Court.—*Hon. Joseph A. Guthrie,* Judge.

REVERSED.

*Lathrop, Morrow, Fox & Moore* for appellant.

*Chas. M. Howell, Langsdale & Howell* and *Jos. S. Brooks* for respondent.

TRIMBLE, J.—Plaintiff held a policy of insurance on the life of her husband, W. Dudley Lewis, wherein, upon his death, the defendant agreed to pay an income of $50 per month for at least twenty years, and throughout her life if she lived longer than that. She brought this suit in Jackson county, Missouri, to recover the monthly sums accruing up to the time the petition was filed, aggregating $300. Verdict and judgment were in her favor, and defendant appealed to the Supreme Court. There, it was held that the constitutionality of the statute under which service was obtained was not an open question at the time the appeal was taken, and that the amount of the judgment fixed the amount involved so as to bring it within the pecuniary limit of our jurisdiction, and, therefore, the case was transferred to this court.

The answer, after admitting the issuance of the policy, the death of the insured and the identity of plaintiff as the beneficiary, set up that the policy was rescinded because certain answers of insured to questions in his application, constituting the basis of the insurance contract, were false, fraudulent, or untrue; that said answers were not full, complete or true, but

misrepresented or concealed the true facts in reference to the matters referred to in said questions, which were material to the risk and upon which statements and representations the defendant relied in entering into said contract and that but for said false, fraudulent or untrue statements and representations defendant would not have entered into said contract. The answer further pleaded that the policy was a Colorado contract and the cause of action, if any, arose under and depended upon the laws and decisions of the courts of that State; that, under them, a misrepresentation or concealment material to the risk made in response to specific inquiries upon which the insurer relies to its injury, voids the policy at the insurer's option, if said misrepresentations or concealment were either false or fraudulent or both in fact or in law; that the law of the Colorado courts is that a warranty whether or not material to the risk, if untrue or fraudulent, voids the policy at the option of the insurer. Plaintiff's reply admitted that defendant made an attempted rescission or cancellation of the policy, but denied the laws and decisions of Colorado to be as claimed, and denied all other issuable matters alleged in the answer.

The application was signed December 5, 1912, the policy was issued December 30, 1912, was delivered shortly after noon on January 6, 1913, and insured died some ten days later. After being notified of his death defendant at once investigated, and, tendering back the premium received and all interest thereon, rescinded or sought to rescind the contract on the ground above stated.

At the trial, plaintiff introduced the policy and rested. The defendant then undertook to make out its defense. The questions and the answers thereto, relied upon to justify the rescission, are not in dispute, and are as follows:

"8. Has any Life Insurance Company ever examined you, on an application for insurance or for any other reason, without issuing a policy? (If so, state name of Company). A. No."

"9   Have you ever had or suffered from any of the
following diseases? Answer "Yes" or "No" to each
part of this query below.   Give explicit answers and
particulars in each case.

(a)   Of the Brain or Nervous system? A. No.

(b)   Of the Heart or Lungs? A. No.

(c)   Of the Stomach or Intestines, Liver, Kidneys
or Bladder? A. No.

(d)   Of the Skin, middle Ear or Eyes? A. No.

(e)   Rheumatism, Gout or Syphilis? A. No."

"10.   Have you consulted any physician for any
ailment or illness not mentioned above?

A.   Yes. Eczema.   One attack; Spring of 1912; two
months duration; of mild severity; results perfect.
Physician consulted and his address: Robert M.
Pollock, Rocky Ford, Colorado."

The contract provided that it should be deemed
to be made and payable in the State of Colorado.   The
insurance was applied for there.   The policy was de-
livered and the premium paid there; insured died there,
and the tender of the premium in rescission was made
there.   It was, therefore, unquestionably, a Colorado
contract; and the rights of the parties thereunder are
governed by the laws of that State.   [Lubing v. Mutual
Life Ins. Co., 207 S. W. 230.]   Consequently, the policy
is not affected by the provisions of section 6937, Re-
vised Statutes 1909, which provides that no misrepre-
sentation made in obtaining a policy shall be deemed
material or render the policy void unless the matter
misrepresented shall have actually contributed to the
contingency or event on which the policy is to become
due and payable.

To prove the misrepresentations or untrue state-
ments contained in the above answers, the defendant in-
troduced a number of physicians, of Rocky Ford,
Colorado, (where insured lived and died), and also two
doctors of Excelsior Springs, Missouri, where insured
went for a short stay during three or four summers.
This evidence covered a searching inquiry into the
health and movements of insured over a period of six or

seven years next before his death; and the tendency of such testimony was to show that insured consulted the said doctors for personal ailments at various times commencing in February, 1906, and extending down to about a month before he died. While some of these consultations would seem to be for mere minor and temprary ills, yet others tend to show, and all of them might be regarded as showing, that insured was suffering with chronic nephritis, or inflamation of the kidneys, known to the layman as Bright's disease, and that insured knew he had it. Of course, if he consulted a physician concerning himself, insured knew he had had such consultation even though he may not have known what the physician found. And in considering this case, we must bear in mind that the defendant is not seeking to defeat a recovery on the ground that insured died of a disease he had at and prior to the execution of the contract and which he represented he did not have, but on the ground that when defendant, for the purpose of ascertaining whether it would enter into the contract, asked the applicant whether he had *ever* had any disease of the stomach, liver, or kidneys, or had *ever* had rheumatism, and to give specific answers and particulars in each case, the applicant replied that he had *none* of them; and when asked if he had consulted *any* physician for *any* ailment or illness not mentioned above, and, if within five years, to give name and address of physician consulted, applicant gave the name of *one* only, and he as having been consulted for eczema. These were matters about which the Company was entitled to have full and frank answers, since the information sought to be elicited lay peculiarly within the applicant's own knowledge and was information important for the Company to have in determining whether it would choose to enter into a contract insuring applicant's life. Of course, a secret, insidious malady like Bright's disease of the kidneys might be wholly unknown to the applicant, and, if so, even if he did have it, his answer that he did not, would not entitle defendant to rescind, unless perchance the applicant had *warranted* that he did not. But the ap-

plicant was bound to know whether he had consulted any physician and would be able to give the names of the physicians consulted, or, if he could not recall their names to state that fact, and then the Company would be in a position to *determine for itself* whether or not it would enter into the contract. The applicant ought not to be permitted to withhold such information and yet nevertheless the beneficiary be allowed to recover, on the ground that the fact of such consulations and the ailments for which they were had were immaterial and had no influence on the question of whether the contract should be entered into, or did not result in causing the insured's death, since that would be depriving the Company of its right to decide for itself whether it would take the risk of applicant's insurance. That would be permitting the applicant to decide for the Company the important question of whether it would insure the applicant's life. Dr. Lawson, of Rocky Ford, insured's family physician, testified that in February and March, 1906, he treated insured for a short time and examined his urine, finding blood and albumen therein but attributed it to a chill he had had and to an overdose of quinine he had taken to cure it. The doctor says he treated him briefly in 1907 for something, he could not remember what—possibly a cold. Also, in June, August and September, 1912, the doctor said he treated insured; and that in June of that year he examined his urine and found perhaps one per cent. of albumen, but told him that it was a matter of no consequence. He further testified that it was not true that it was of no consequence, yet he told him that for its psychic effect. On cross examination he said that had he thought it a serious condition he would have so advised him. He treated him at this time for scabies, a skin disease, manifesting itself on the inner side of his legs but which yielded to local treatment, which it would not have done had it been caused in any way by disease of the kidneys. He testified that the presence of albumen in the urine at times might arise from various causes and unless it was a continuing manifesta-

tion, it did not necessarily indicate Bright's disease.

Dr. Kellogg, an Osteopath, testified that he gave insured osteopathic treatments every year between 1905 and 1912. And in May and June, 1912, he gave insured treatments for stomach and liver trouble; that the area around the gall bladder was apparently enlarged and slightly congested. At this time insured had an eruption on his legs from his knees down and the doctor treated him for his circulation. The stomach and liver trouble was said by the patient to have been caused by his eating too much. The treatments prior to 1912 were to relieve contraction of the muscles between the shoulder blades caused by insured lifting heavy articles, he being a hardware merchant.

Dr. Maier, of Rocky Ford, testified that in October, 1912, insured asked him to examine his urine to see what condition his kidneys were in, saying he felt a little bloated. The doctor says he asked him if he had had kidney trouble and insured told him he had; that insured's abdomen was somewhat distended; that he found between fifteen and twenty per cent albumen in his urine by chemical analysis; that he told insured the result of his examination; and insured said his kidneys had been affected for three or four years. The doctor diagonised the case as chronic Bright's disease and so told insured, who remarked, 'I was afraid of that'' and said that Dr. Lawson and Dr. Blotz had treated him.

Dr. Van Antwerp, of Rocky Ford, "a Chiropractic and Spondylotherapist" testified that he treated insured about two weeks in March, 1912, for stomach and liver trouble, and then a month later treated him for two days for a cold or grippe; that while massaging insured's spine he found that a place over certain nerves leading to the kidneys was complained of as being sore and insured asked the cause of it, and when it was explained to insured that the kidneys were being overworked through failure of the liver to properly eliminate its share of the poisons, insured told him that Dr. Lawson was making a urinary analysis, and later insured told Van Antwerp he had learned from Dr.

Lawson that he was now passing less than one per cent. albumen.

Some time in the fall of 1912, insured went to Excelsior Springs, for a stay. Dr. Rice of that, city testified that on November 7, 1912, according to his books, he was called in the night to treat insured at his boarding house. The patient was in bed suffering with colic and vomiting; and insured told him he had eaten something that disagreed with him. Dr. Rice thought it was acute indigestion; and as he learned that insured had had another Excelsior Springs 'physician before Dr. Rice was called, the latter did not examine him or do more than to relieve his present condition and then relinquish the patient to his former physician. This was Dr. Maxwell, but he was dead at the time of the trial and his testimony was not obtained. Dr. Rice testified that in Bright's disease the patient has such sickness with pains in the stomach and vomiting.

Dr. Bogart, of Excelsior Springs, testified that in September, 1909, W. D. Lewis of Rocky Ford, Colorado, consulted him, and the doctor found he had some rheumatism as a result of uric acid, that he was nervous and had a torpid liver and bilious condition; that the doctor prescribed certain waters of the Springs for him to drink. The doctor testified that either he or his assistant examined the urine of every patient and that it was his custom to do so at that time and to not let a patient go away with diabetes, rheumatism or Bright's Disease without finding it. He kept a card index system with a card for each patient examined, with the result thereof stated thereon and a copy of the diagnosis. This card was produced and showed "Uric acid, Rheumatism, Neuroses Torp. L." He further said he told Mr. Lewis the diagnosis he made.

Dr. Blotz, of Rocky Ford, testified that sometime in the fall of 1912, either in the latter part of November, or first part of December, Mr. Lewis was brought to him by one Hall, agent for another insurance company of which Dr. Blotz was Examiner, with the request, made in Lewis's presence, that the Doctor examine him

and if he found anything that would prevent him from obtaining insurance, the doctor should not send in his examination to the company; that he examined Mr. Lewis' urine and found a definite albumen reaction and that his conclusion was he was not an insurable risk in the company for which he was examining. The doctor says that Mr. Lewis had just returned from Excelsior Springs at the time of this examination. On cross examination he said he would not say whether the agent came to him before Lewis did or at the same time; that he treated Lewis for a skin affection on the legs about a year before his death. No policy was issued by that company, no application being made.

Hall, the agent referred to in Dr. Blotz's testimony swore that in talking with Lewis's partner about taking more insurance, Mr. Lewis asked what it would cost him for a policy of $5000 and who was the examiner; that Lewis, when told it was Dr. Blotz, said he would see him that day. Hall says he saw Dr. Blotz afterwards and, learning that his examination had resulted unfavorably, dropped the matter of insuring Lewis, for the time at least.

None of the facts tending to be shown by the foregoing evidence were admitted by the plaintiff, but no effort was made to contradict said testimony beyond a cross examination of each witness in an attempt to bring out whatever might affect its credibility or which might form a basis from which the jury might draw inferences contrary to the statements made in chief.

The Medical Examiner for the Company was Dr. Robert M. Pollock, of Rocky Ford, and in his "Medical Examiner's Report" attached to the application, he stated that after careful inquiry and physical examination he found no evidence of past or present disease, of the Brain or Nervous System, of the Heart or Lungs, of the Stomach or any abdominal organs, of rheumatism or gout, or of the skin, middle ear, eyes, or any part of the body. Dr. Pollock was also the attending physician in insured's last illness, and in the proofs, of death, in answer to the question, what disease

was the immediate cause of death?, stated ''Acute cardiac dilatation; myocarditis and acute nephritis following La Grippe'' and that deceased had suffered therefrom ''about thirteen days.''

There was evidence in behalf of plaintiff that many things besides kidney trouble may cause albumen to be found in the urine, at least temporarily; that acute nephritis, or acute inflammation of the kidneys, is not Bright's disease and it only when the inflammation has become chronic that it is called Bright's disease; that only continued discharge of albumen in the urine is indicative of Bright's disease. Defendant insists that albumen was found in insured's urine in 1906 and perhaps prior thereto and again in 1912, and the inference from this is that there was albumen in his urine during the intervening years. Dr. Bogart, however, does not seem to have found any in 1909, and defendant's Medical Examiner on December 5, 1912, found none. In opposition to defendant's claim that insured went every year for several years to Excelsior Springs because he had kidney trouble, the plaintiff offered evidence that he went there merely on pleasure trips for vacation and rest, at times when he went to Kansas City to buy goods. There was also evidence that acute nephritis or inflammation of the kidneys could come on suddenly as the result of sudden cold, exposure or other causes and such disease could kill a man within thirteen days and sometimes in forty-eight hours; that dilatation of the heart and myocardits, or inflammation of the muscular tissue of the heart, could develop from the heavy strain placed by La Grippe on the heart in the time first above mentioned. On the other hand, defendant's evidence was to the effect that the deterioration in the heart tissues would not arise in so short a time but indicated an unfavorable condition much longer than that. All the evidence showed that insured was a strong, hearty, active, man of good build and healthy appearance, actively engaged in the vigorous work necessary in handling his hardware, clear up to the time of his illness and death. It appears, however, that a

man can have the appearance of being well and strong
and yet have kidney disease. The only witnesses who
testified to matters showing that insured had kidney
trouble or that he had it and knew it, were Drs. Maier
and Blotz. However, the credibility to be given their
testimony, as well as that of all the witnesses, was for
the jury to determine. Consequently, if the purpose of
defendant's testimony were to prove, or if it is essential
to the Company's defense to prove, that insured had
kidney trouble and that, without regard to whether he
knew it or not, his death was contributed to and caused
thereby, we could at once say the defense had not
been maintained, since the jury had found against it
and there was evidence to sustain that finding.

But, if the question be whether the Company had
the right to cancel the policy because the insured's
answers to the Medical Examiner were not full, true
and complete, but on the contrary were such as to mis-
lead and deceive the Company as to the character of
the r sk and lead it to enter, without further exam-
ination, into a contract it would not have made had
true answers been given, then it would seem that a
successful defense would not demand the absolute es-
tablishment of the fact that insured did have kidney
trouble and died therefrom, or that insured knowingly
deceived the defendant in regard thereto or in regard
to matters which prevented the Company from investi-
gating still further. If the situation, disclosed by full,
complete and true answers to the questions, was such as
to reasonably warrant the Company in wholly refusing
to enter into the contract or in refusing to go into the
contract without making a further careful investigation
into the situation in order to determine for itself
whether it would assume the risk or not, then it would
seem that insured's knowledge or lack of intention to
deceive, would be immaterial.

The evidence of defendant's Medical Board and
Chief Officers was to the effect that the application
with the answers therein made by insured presented a
most favorable insurance risk, and upon it the acceptance

thereof and the issuance of the policy was advised; that the answers were believed and relied upon; that if the answers had disclosed that insured had consulted various doctors for other ailments than eczema, it would have raised a doubt of the acceptability of the applicant and they would not have recommended the risk; that the presence of albumen in the urine in whatever quantity, whether large or only a trace, is a grave and serious matter; that such a condition always increased the mortality rate; that had the answers disclosed that other doctors had been consulted, the application would not have on its face presented a first class risk as it did, but would have caused an immediate suspension of all further action on the application until the Company could make for itself a thorough investigation to find out what the consultations were for and all about them; and that had it been disclosed that albumen was in the applicant's urine, the risk would have been declined.

Some reliance appears to be placed by plaintiff on the suggestion that the answers are mere representations and are in no sense warranties or to be given the effect of warranties. The policy says the contract "is made in consideration of the sum of" the cash premium named, and in consideration of the payment of a like sum every year thereafter until death of insured, and no other consideraton was mentioned. There was a further provision that the policy and the application should constitute the entire contract and all statements by the insured should, in the absence of fraud, be deemed representations and not warranties, and no statement should avoid the policy or be used in defense of the claim under the policy unless contained in the written application. This provision might seem to indicate that if there were fraud in the statements given in the application, then they could be treated as warranties and accorded that effect. If the application stated he had consulted but one physician and that for eczema, when in fact he had consulted a number of physicians for other ailments, such statement or representation

was certainly about a matter within applicant's knowledge and was untrue; and since it related to a matter forming the very basis or foundation of the contract, involving the defendant's right of choice in accepting or rejecting the contract, its untruthfulness would work a legal fraud on the Company whether the applicant personally intended to deceive the Company or not. The provision in the policy does not say whether the fraud referred to was legal or actual fraud; and it might be regarded as including both unless the principle, that the contract should be construed least favorably to the one who prepared it, requires that the term be construed to mean actual fraud only. But, without regard to either actual fraud or warranty, the provision further clearly shows on its face that statements contained in the application will afford a basis for avoiding the policy, the question what kind of statements will have that result being left to the law under which the contract is to be construed and enforced. For this reason and inasmuch as the questions and answers are in reference to matters which the Company was clearly entitled to know in order to decide whether it would enter into the contract, and the statements therefore affect the very basis of said contract, it is somewhat difficult to see, especially under the Colorado decisions, just what difference is made, in this particular case, by the distinction between misrepresentations and warranties. As stated in Schas v. Equitable Life Ins. Co., 166 N. C. 55, if the representation is false and material, that is, is 'such representation as would have influenced the action of the Company upon the application in regard to whether or not it will grant the insurance, it will vitiate the policy unless the Company has in some way waived the benefit of it by its conduct and with knowledge of the facts.'' It is further said that, ''every fact which is untruly stated or wrongfully suppressed must be regarded as material, if the knowledge or ignorance of it would naturally and reasonably influence the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or

in fixing the rate of premium." And further that it may be stated as general rule that "where, in an application for insurance, a fact is specifically inquired about, or the question is so framed as to call for a true statement of the fact, or to elicit the information desired, reason and justice alike demand that there should be a full and fair disclosure of the fact, or at least a substantial one." And as to what matters should be considered material, the opinion just cited says it is not necessary that the thing misrepresented should have contributed in some way or degree to the loss for which indemnity is claimed, but that the determining factor as to materiality is "whether the answer would have influenced the Company in deciding for itself, and in its own interest, the important question of accepting the risk . . . The questions generally are framed with a view to estimating upon the longevity of the applicant, and any answer calculated to mislead the company in regard thereto should be considered as material."

In McDermott v. Modern Woodmen, 97 Mo. App. 636, although the statement in that case was a warranty, yet the cases cited and the remarks of the court show that the questions as to whether the applicant has consulted physicians were considered to be in the highest degree material. The court said the contract could not be reasonably interpreted as asking only for the names of physicians who had treated applicant for grave diseases leaving him to decide on the first instance, and the jury in the last, whether his ailment was grave or not. In the case at bar, the applicant could not help but understand that all physicians consulted were asked for whether the ailment was grave or not, since he named one physician and said that he was consulted for eczema.

In Aloe v. Mutual Reserve Insurance Co., 147 Mo. 561, 578, it is said:

"It was shown by several physicians who testified on the part of defendant on the trial that the statements made by Aloe in his application for insurance, that he

had not consulted or been treated by a physician in thirty years, were untrue. The object of this inquiry suggests itself. If he had not consulted or been treated by a physician during that time that was the end of it. But if he had consulted a physician or been treated by one during that time the defendant had the right to know it, by whom and what for, so that it might ascertain the particulars from him. [U. B. Mutual Aid Society v. O'Hara, 120 Pa. St. 256.] It has been repeatedly held that such questions called for important information which the assured was bound to give truthfully. [McCollum v. Ins. Co., 55 Hun. 103; s. c., 124 N. Y. 642; Cobb v. Covenant Mutual Benefit Ass'n, 153 Mass. 176; U. B. Mut. Aid Soc. v. O'Hara, 120 Pa. St. 256; Ins. Co. v. McTague, 49 N. J. L. 587; Cunningham v. Ins. Co., 89 Me. 37; Mengel v. Ins. Co., 176 Pa. St. 280.]"

In Metropolitan Life Ins. Co. v. McTague, 49 N. J. Law, 587, 592, one of the cases cited above, speaking of a representation that applicant had not consulted a physician, it is said:

"That representation did not aver a condition of health, or that it was requisite or proper to consult a physician. It averred that he had not consulted a physician or been prescribed for by a physician. The fact found contradicted this averment, whether the consultation and prescription related to a real disease or an apprehension of disease. Indeed, so material does such a representation seem to be to the contract proposed by the application that, in my judgment, if made falsely and knowingly, it would avoid the contract."

In Kasprzyk v. Metropolitan Life Ins. Co., 140 N. Y. Supp. 211, 214, the insured represented he had not been treated by a physician when he had, and the court said: "The misrepresentations made by the insured were concerning matters vital to the risk and rendered the policy void whether the applicant knew of their falsity or not.

In Germania Life Insurance Company v. Klein, 137 Pac. 73, a Colorado case, the applicant stated she had

not consulted a physician and did not have any of the diseases inquired about. As a matter of fact she had consulted a physician though he did not tell her what he found. The court held that this false statement was sufficient to invalidate the policy whether the false statement be regarded as a representation or warranty. At page 75 the court said—

"A false statement or declaration of a fact material to the risk, and upon which the policy is based, will avoid the policy, whether that misrepresentation be the result of intention or of mistake, and whether made in good faith or not so made. Such misrepresentation is as fatal to the policy as a breach of warranty. [1 May on Insurance, Par. 181; 3 Cooley's Briefs on Law of Insurance, pp. 1950a to 1954d; Trav. Ins. Co. v. Lampkin, 5 Colo. App. 177-183, 38 Pac. 335; Sun Fire Office v. Wich, 6 Colo. App. 103, 39 Pac. 587; Des Moines Life Ass'n v. Owen, 10 Colo. App. 131, 134, 50 Pac. 210; Nat. Mut. Fire Ins. Co. v. Duncan, 44 Colo. 472, 476, 98 Pac. 634, 20 L. R. A. (N. S.) 340; Northwestern L. A. Co. v. Tietz, 16 Colo. App. 205, 64 Pac. 773; Am. Bond & Trust Co. v. Burke, 36 Colo. 49, 58, 85 Pac. 692; 2 Cooley's Briefs on Law of Insurance, p. 1166.]"

And as to the materiality of the representation, the court, on the said page, said that no inquiry "can be made more material to the risk and more essential to properly advise the Company contemplating or considering the issuance of a policy, and which would more probably influence it in determining whether it would enter into the contract, than the question as to whether the applicant had consulted a physician, or what physician she had consulted." The court held further that the materiality of the fact of consultation does not depend upon the gravity of the subject of the interview as regarded by the patient, and said, (p. 76): "That statements as to consultations of or attendance by physicians under such circumstances are material to the risk, and if false avoid the policy to the same extent as if they had been express warranties, is supported by both reasons and authority," citing 25 Cyc. 801; 2

Cooley's Briefs on Law of Insurance 1166, and many other cases.

In American Bonding, etc., Co. v. Burke, 36 Colo. 49, where the action was on an indemnity bond and the defense was untrue statements given in answer to specific inquiries made before making the bond, the court said the same principles applicable to fire and life insurance should govern, and on p. 58 said—

"Our conclusion, therefore, is that a misrepresentation material to the risk, made in response to a specific inquiry, upon which an obligor relies to his injury, avoids the policy at the option of the latter. So that, applying the principle to the facts of this case, whether Burke's answers given to the questions propounded by the obligor were warranties or representations merely, they avoid the policy if, in fact, untrue, irrespective of his good faith in making them."

In opposition to defendant's contention that its demurrer to the evidence should have been sustained, the plaintiff says she made a prima-facie case and whether insured has the various consultations alleged and what the doctors found, depends upon the credibility of the defendant's witnesses who testified in regard thereto, and, as the credibility of the witnesses is for the jury to pass upon, the court cannot, in effect, declare that defendant's witnesses must be believed, and direct a verdict in defendant's favor. We need not decide the question whether the rule thus invoked applies where the prima-facie case made by a plaintiff rests upon a presumption of *law* rather than of *fact,* and the evidence of the opposite party although conceding as true all that the plaintiff's evidence asserts, nevertheless presents evidence which, while not contradicting that of plaintiff's, yet shows that the presumption relied on is destroyed. Where a plaintiff's case rests on parol testimony which is not admitted by defendant, then, even if plaintiff's evidence is not contradicted and it all one way, the court cannot direct a verdict in the plaintiff's favor; and it would seem that a defense based on parol testimony, although uncontra-

dicted, must likewise be left to the jury to pass upon its credibility. But in the case at bar, it was elicited from witnesses introduced by plaintiff that insured had taken treatments from Dr. Van Antwerp, and also from Dr. Kellogg at times, and that they were for stomach and liver trouble, and that stomach trouble was one of his complaints; that some of these treatments by Dr. Antwerp were in 1912 and were for stomach trouble. It was elicited from plaintiff herself that Dr. Lawson examined insured's urine in 1906; that insured consulted and was examined by Dr. Bogart in Excelsior Springs in 1909; that Dr. Lawson treated him in 1912 for scabies, or rash on his legs; that he did take treatments from Dr. Van Antwerp; that he took osteopathic treatments every year from 1906 to 1912; that Dr. Van Antwerp treated him in 1912, but she did not know what it was for; that Dr. Kellogg also treated him in 1912 and that he occasionally had billious attacks; that when insured got to Excelsior Springs *he always went to a doctor;* that he went to Dr. Maxwell in Excelsior Springs in November, 1912, and once, in Dr. Maxwell's absence, insured called in Dr. Rice.

So that while it is not conceded that any of the doctors found what they said they found, or that insured was suffering from albumenuria, yet it is conceded that he did consult nearly all of the doctors who testified for defendant, and that he did have stomach and liver trouble and a skin disease other than the one he reported. He said in his statement he had consulted only one doctor for any personal ailment and that for eczema only, and that he had not had any disease of the stomach, liver, kidneys, etc., nor rheumatism. Clearly, the insured was consulting these various doctors for some ailment; and clearly he could not have failed to remember the fact of such consultations, at least those in a month or so before his application, especially when he did recall and take pains to state a consultation for eczema in the Spring of 1912.

It is not a question of whether these consultations were for Bright's disease or whether he was suffering

201 M. A.—5

therefrom or his death hastened thereby; nor is it a question of whether he thought these consultations were material or not. He was answering questions which the Company wanted to know the truth about before it would enter into the contract. It had the right to know the truth in order that it could decide for itself whether it would insure him or not. If it had known he had consulted various other doctors recently and for other matters, it could have investigated on its own account and decided for itself whether it would take him as a risk. Nor would it have been necessary then to establish beyond doubt that he was in fact suffering with a serious and insidious disease; for at that time the Company had not entered into the contract, could not be compelled to do so, and could be as "squeamish" about accepting him as a risk as it desired to be. If it was fearful that he might have incipient Bright's disease, it could have refused the insurance though all the world said he did not have it. To allow him to refrain from giving full, true and complete answers to the specific questions then asked, on the ground that he did not think the answers material, would be to let him decide for the Company whether it should undertake the risk.

We do not say that mere failure to recall and state that a doctor was spoken to for some simple trifling matter, having no significance either to doctor or patient, ought in all cases to justify a rescission of the contract. But where there has been a continuous and repeated consultation of physicians extending over a period of time, with circumstances likely to raise apprehension in the mind of a reasonably prudent person that perhaps there might be some reason for suspecting unfavorable conditions, and possible grounds for not accepting the applicant as a risk, then a failure to make full, complete and true answers ought to afford ground for rescission if not otherwise waived, and is acted upon promptly.

In addition to pleading that insured's statements were false and untrue, the answer further charged that

the same were made knowingly and with the intent on the part of insured to deceive and defraud the Company; and some point appears to be made that since this was contained in the answer, the defendant should be held and limited to a defense specifically based on that. As stated before, we do not see how it was possible for insured not to know that his statement as to consultations was untrue, and to that extent at least the untrue statements were knowingly made. But, if defendant pleaded a good defense of rescission based on untrue statements, we do not think it is destroyed or nullified merely because the answer went further and also charged that the statements were knowingly and fraudulently made with the intent to mislead and deceive the Company. The defendant is defending; it is merely attempting to ward off the assault made upon it by plaintiff's cause of action, and if one defense is sufficient it is not neutralized by the fact that the answer charged a still further defense that the statements made were fraudulent in point of fact. The situation is different from that of a pleader who is asserting a cause of action and seeking to enforce it, for there the one who offers battle and chooses his battle field must fight it out on the ground chosen and not elsewhere. But the defendant can rely upon as many shields as he can interpose and rely upon any one of them if sufficient.

Under our view of the case, the defendant was entitled to rescind, and as it promptly took every step necessary to entitle it to do so, the demurrer should have been sustained. The judgment is, therefore, reversed. All concur.