[No. 13551.   Department Two.   March 2, 1917.]

Mildred I. Brigham, *Appellant*, v. Mutual Life Insurance Company of New York, *Respondent*.[1]

Insurance—Life Insurance—Application—Warranty — Statute —Intent to Deceive.  Misrepresentations as to previous illness and physicians consulted, made by an applicant for life insurance, will not vitiate the policy, under Rem. Code, § 6059-34, providing that no misrepresentation or warranty in the negotiation of the contract shall be deemed material or defeat the policy unless it was made with intent to deceive; it being necessary to prove the intent.

Same—Intent to Deceive—Evidence—Admissibility.  In an action upon a life insurance policy, upon an issue as to whether misrepresentations as to the assured's previous state of health were made with intent to deceive, within the meaning of Rem. Code, § 6059-34, it is error to exclude evidence that the examining physician, who was the agent of the insurance company, had been previously told of the assured's previous illness, since his knowledge was the knowledge of the company.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered March 14, 1916, upon granting a nonsuit, dismissing an action on a life insurance policy, tried to the court and a jury.  Reversed.

*Geo. S. Cole*, for appellant.

*Hughes, McMicken, Dovell & Ramsey*, for respondent.

Morris, J.—Action on a life insurance policy brought by the wife of the deceased, beneficiary named in the policy. The lower court held that the action must fail because of misrepresentations made by deceased in the application upon which the policy was issued.   Respondent pleaded and proved as an affirmative defense that, at the time of making the application for the policy on July 21, 1913, the insured made the following representations:

"(17)   What illnesses, diseases, injuries, or surgical operations have you had since childhood?   None.

[1]Reported in 163 Pac. 380.

"(18) State every physician or practitioner who has prescribed for or treated you, or whom you have consulted in the past five years. None.

"(19) Have you stated in answer to question 17 all illnesses, diseases, injuries or surgical operations which you have had since childhood? (Ans. Yes or No.) Yes.

"(20) Have you stated in answer to question 17 every physician and practitioner consulted during the past five years and dates of consultation? (Ans. Yes or no.) Yes."

The evidence shows that, in April, 1910, the insured fainted while at work. He was carried into a nearby house, and later went to his own home without assistance, though accompanied by his brother. A physician was called after the insured reached his home, and testified that he found him in bed but "perfectly himself, mentally and every other way." The next morning this physician, Dr. Davis, made a more complete examination of the insured, including his urine, in which some albumin was found. Rest and a diet were prescribed. The examinations of the urine were continued for a period of two or three months, though only the one professional call was made. The albumin gradually diminished until, in the last examination, it entirely disappeared. On January 17, 1911, the insured went to another physician, Dr. West, for a physical examination. He told Dr. West that Dr. Davis had treated him some time before for albuminuria. Dr. West examined the lungs and heart action and also the urine, subjecting it to the usual tests. The urine was found to be without albumin, though there were found to be some phosphates which the doctor testified indicated nothing more than a nervous state. He also testified that this examination indicated nothing in the nature of an organic disease, but as the urine was slightly discolored, other examinations were made on January 30, May 20, and June 30. As the result of these examinations, Dr. West found insured in practically normal health. In June, 1911, while on his way to Whidby Island, insured again fainted. He recovered in a few minutes and appeared perfectly normal

thereafter. No physician was called at this time. He was then on his way to take part in a Chautauqua, and fulfilled his engagement of one week in apparently good health. In August, 1911, the insured moved to Sumas. On September 6, 1911, Dr. Dalton, of Sumas, who was respondent's medical examiner at that place, at insured's request, made a physical examination of him, including his urine. Dr. Dalton continued his examinations of the insured for some time, and testified in regard to such examinations, in part as follows:

"I believe I made two or three physical examinations of Lew H. Brigham. These physical examinations together with the urine examinations were satisfactory to me as diagnoses of his condition. I believe I took his blood pressure at the time. The urine examinations were thorough as I remember. My habit is to give the urine a thorough examination, including microscopical. By the several diagnoses I have testified to I came to the conclusion that Brigham was in normal health. I reached that conclusion at the end of each diagnosis to which I have testified. After making each of these diagnoses I always told him that there was nothing the matter with him. The diagnoses were satisfactory."

Some time thereafter, Dr. Dalton or his assistant, Dr. Thompson, recommended Brigham to respondent's solicitor as a good insurance risk, and on July 21, 1913, Brigham appeared before Dr. Dalton to take the medical examination. Dr. Dalton testified that, at this examination, he wrote the answers to questions 17 to 20, inclusive, as insured responded; that, at the time, he knew nothing of his condition which would lead him to believe the answers to these questions, or any of them, were incorrect. When he wrote the answer, "None," to question 18, he had not forgotten the numerous examinations, consultations and prescriptions to which he had referred in his previous testimony, but that he did not consider they affected the risk in any way. Upon these facts, the lower court sustained a challenge to the sufficiency of the evidence. Counsel for respondent now contend that the lower court affirmatively found in these answers an intent to de-

ceive. This contention is not sustained by the record, which discloses that the lower court was of the opinion that, when it appeared that the answers were false, such falsity alone and of itself vitiated the policy. This is shown by the following observations of the lower court in ruling upon the admission of testimony and in sustaining the challenge to the sufficiency of the testimony:

"The only issue here is whether he correctly answered these questions and if so whether the insurance company shall be excused from paying the policy on that ground. . . .

"It seems to me these matters are vital. The applicant at the time he made his application for insurance did fail to disclose them. They are matters the company had the right to know. They were representations relied upon by the company and it was fraud to conceal them. . . .

"The question here is whether or not he answered truthfully these questions that were put to him in his application for insurance."

These holdings of the lower court, to our mind, indicate a wrong view of the law, in the light of Rem. Code, § 6059-34, which provides in part as follows:

"No oral or written misrepresentation or warranty made in the negotiation of a contract or policy of insurance, by the assured or in his behalf, shall be deemed material or defeat or avoid the policy or prevent it attaching, unless such misrepresentation or warranty is made with the intent to deceive."

It is not enough under this statute to find that the representations were false. It must further be found that they were made with intent to deceive. Under the peculiar facts in this case, such question should have been submitted to the jury.

Another error shown by the record was in the exclusion of testimony offered by a brother-in-law of the insured, to the effect that, in July, 1911, just prior to the time when insured moved to Sumas, he called on Dr. Dalton, at the request of insured's mother, and told the doctor of the in-

cident which resulted in the calling of Dr. Davis in April, 1910. That he then told Dr. Dalton that the reason why he called upon him and disclosed this information was because it was the first time insured had lived away from home and his mother was anxious about him because of his previous physical condition and wanted him to be subjected to medical observation. The insured moved to Sumas in August, 1911, and his first consultation with Dr. Dalton was September 6, 1911.

This testimony should have been admitted, as, in connection with the testimony of Dr. Dalton, it went to the question of whether or not Dr. Dalton knew of the previous condition of the insured. It could not be held, as a matter of law, that there was an intent to deceive and withhold from Dr. Dalton knowledge that he already had. One is not deceived by the failure to disclose facts already within his own knowledge. For this reason, Dr. Dalton's knowledge of the previous medical history of the insured at the time these answers were given is a vital fact in this case entitled to be shown. If there was any intent to deceive, that intent must have been present in the mind of the insured at the time he made his application for insurance. It might well be inquired whether or not such an intent was in the mind of the insured at a time when he had fully submitted himself for such examination and tests as the doctor desired to make in order to fully ascertain his condition. It is not an unwarranted inference, in order to give Dr. Dalton all the available information, that the insured fully disclosed the history of his case so far as he knew it. The record discloses no intent to withhold any information from the doctor, but, on the other hand, shows that Dr. Dalton well knew the bodily condition of the insured and was then of the opinion that nothing in that condition affected him as a good insurable risk.

Respondent asserts that the ruling complained of is supported in *Quinn v. Mutual Life Ins. Co.*, 91 Wash. 543,

158 Pac. 82. Stripped of its facts, language can be found in that opinion which is favorable to respondent's contention. In that case, however, this court, as did the trial court, reviewed the facts, there being no jury below. We found both a misrepresentation and the intent to deceive from the facts, the record disclosing that, at the time he made his application, Quinn was affected with syphilis and was taking treatment therefor; that instead of his physical condition being known to the examining physician, as in the present case, the examining physician knew nothing of it except as disclosed in the answers to the questions asked. Quinn died thirty-four days after the date of his policy, and we held that the misrepresentations not only were made with intent·to deceive, but that they contributed to the loss. The facts in this case would not support such a finding. The difference in the facts makes the difference in the law. We did not intend to hold in the *Quinn* case that misrepresentation alone was sufficient, as that would be flying into the teeth of the statute, which was referred to in the opinion followed by this observation:

"In view of this statute, the only fact to be determined is whether or not the representations made by the applicant were made, as the court found, without intent to deceive."

This language can mean nothing else than that the intent to deceive must be found as a fact. This can be the only interpretation of the statute, and if it be assumed that the *Quinn* case establishes a contrary rule it is now departed from.

The judgment is reversed, and the cause remanded for new trial.

MOUNT, FULLERTON, PARKER, and HOLCOMB, JJ., concur.