## PRUDENTIAL INS. CO. OF AMERICA v. WINN.*
### No. 7331.

Circuit Court of Appeals, Ninth Circuit.
May 31, 1934.

*Rehearing denied Aug. 29, 1934.

Bundy & Swale, of Seattle, Wash., for appellant.

Lawrence Bogle, Cassius E. Gates, and Claude E. Wakefield, all of Seattle, Wash., for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

GARRECHT, Circuit Judge.

This action was brought in the superior court of the state of Washington to recover upon two policies of life insurance of $10,000 and $15,000, respectively, written by the appellant November 28, 1930, upon the life of Joseph L. Winn, husband of appellee. The case was removed to the federal court. The amended answer of appellant admits the issuance of the policies and the payment of premiums, and seeks to avoid the policies on the ground of misrepresentations and concealments alleged to have been made by the insured in his medical examination.

The amended answer sets forth that the insured's application for the insurance policies was the basis and chief inducing consideration for the issuance of said policies of insurance; that it relied implicitly on the statements and representations made by the insured in said application and in his answers made in his declarations to the medical examiner; that for the purpose of knowingly deceiving and misleading the appellant company into issuing said policies of insurance, the insured represented in said declarations that within three previous years immediately before making said declarations and signing said application he had been attended by no physician except Dr. Wm. Turner in 1929, who treated him for acute inflammation of the pharynx, and for which he was not disabled. Whereas, at the time of signing said application and making said declarations the insured knew that he had been under the care and treatment of various physicians and surgeons; that in December, 1927, he voluntarily submitted himself for examination to ascertain his condition, and that he was then advised that his trouble was due to peptic ulcers and chronic cholecystitis, and was at that time advised that an operation was necessary to cure or to check the advance of said diseases, and that his gall bladder was in a bad condition; that in the fall of 1928 the insured again submitted to a physical examination for the purpose of ascertaining the condition of his abdominal region, and was advised that he had ulcers of the bowels and colon and that a surgical operation was necessary to check or to cure said condition. In said written declarations in his medical examination the insured stated that he had never had any serious illness other than appendicitis in the year 1904.

Appellant further alleged on information and belief that the insured was from the 12th day of December, 1927, to the 28th day of November, 1928, and until the time of his death, seriously ill and afflicted with chronic cholecystitis and peptic ulcers, and had been advised to have a major operation for the remedying of his condition; and that the said insured concealed the fact of said sickness for the purpose of misleading the appellant and inducing it to write said policies.

The amended answer also alleges that insured's death was directly caused from the advance of the diseases he was afflicted with from and before 1927 to the time of his death, of which he had full knowledge and information, and which he concealed and kept from the defendant, and by reason of which the said policies never became valid existing contracts. There were also allegations concerning misrepresentations with reference to the use of intoxicating liquor, which have been abandoned in this appeal.

The insured, Joseph L. Winn, at the time of his application for the policies was 57 years of age; he was actively engaged in business and was of robust physique and in apparent good health. All of the lay testimony was to the effect that up to the time of his last illness the insured worked hard, enjoyed life, and had the appearance of one in the possession of good health; and that his reputation for truth and veracity was good.

Dr. J. M. Blackford, a specialist in diagnosis, called by appellant, testified that he was connected with the Virginia Mason Hospital and Clinic; that he examined decedent on December 5, 1927, and again on December 10, 1927, in his office; that at the time of his visit insured was complaining of trouble with his stomach. He gave a history of an earlier attack of appendicitis and an operation some eighteen years before, from which he had a complete recovery, so far as he knew, and that his health had been excellent until six or seven years before his visit, when he began having attacks of stomach trouble

lasting up to a month; that he had been so bad the day before as to prevent his sleeping that night; and he further stated that an operation had been advised by some surgeon six years before. The doctor further testified that decedent stated that the pain was usually located in the upper abdomen; that he had never called a physician for these attacks; that soda usually relieved them by raising the gas; that the pain was so severe that he thought several times that it might kill him. He said that it usually followed overloaded stomach or the taking of iced drinks, and that he had noticed increasing shortness of breath and palpitation. However, he played golf without difficulty and never suffered with any pain in the chest or arms with exercise.

The doctor further testified:

"I tentatively diagnosed Mr. Winn's condition as peptic ulcers and chronic cholecystitis. The diagnosis was tentative because the objective evidence by X-ray of both stomach and gall bladder was quite inconclusive and yet he had definite and violent symptoms. By inconclusive I mean that under the X-ray the outline of the stomach and upper part of the intestines was normal and we could not make an objective diagnosis of ulcer of the stomach or duodenum. My diagnosis was made entirely upon what the patient told me.

"In making an X-ray of the gall bladder, certain dyes are given which are eliminated from the body exclusively by the liver, and those dyes are opaque to the X-ray and will throw a shadow if they are of sufficient concentration. If the gall bladder is working efficiently, concentrating bile, which is its function,—in an X-ray of the normal gall bladder, it shows up, but if abnormal it fails to show. This test, while strong presumptive evidence, is not always correct, and in this instance it showed once a rather faint shadow and the second time clearly, which would indicate that at that time the function of the gall bladder was good."

On further cross-examination the doctor testified:

"An X-ray was taken of the stomach and duodenum and they did not show presence of any ulcers. In proper hands, an X-ray of the stomach for the purpose of determining ulcer, will be correct, about nine times out of ten. * * *

"My diagnosis of cholecystitis and peptic or pyloric ulcer was made largely on the subjective symptoms that the patient related to me. That is the way most diagnoses are made."

In November of 1928 the insured again visited the clinic and on this occasion was examined by Dr. Dowling, who testified that at that time he was complaining of trouble with his stomach. The doctor testified that he got practically the same history of complaint that Dr. Blackford had. The interim history he gave was that he had been substantially the same, or possibly a little worse. The doctor testified further:

"From my examination I made a tentative diagnosis. From all of the findings, and repeating the physical examination and examination by the instruments of precision, all of which were again negative, we arrived at the conclusion, forced on us by his complaint of pain and indigestion, that he had something seriously wrong with him, which I was inclined to think was due to his gall bladder, a cholecystitis.

"I advised him at that time, that in my opinion, nothing but a surgical operation could relieve him. This he did not want to undergo and because the diagnosis was rather indefinite, I did not urge upon him the absolute necessity of a surgical operation at that time."

On cross-examination he further testified:

"* * * The cholecystogram test showed a normal function of the gall bladder. X-ray showed normal outline of the stomach and duodenum. From the objective tests, I was unable to give a definite opinion of cholecystitis. No diagnosis was ever made or offered to Mr. Winn that was anything more than a tentative diagnosis as a working basis for advice and treatment. Mr. Winn understood that my diagnosis was tentative and that the operation advised was an exploratory one.

"In my examination, peptic or pyloric ulcer was not mentioned but was considered, but I came to the conclusion, tentatively, that his trouble was more probably in the gall bladder and to that extent I did not agree with Dr. Blackford's diagnosis."

Several weeks later insured had an attack of influenza and was confined to his bed for several days. After he got up he did not get his strength back readily; he then went to Portland, Or., and called on Dr. Sears, who examined him fully on December 31, 1928.

The following are pertinent excerpts from Dr. Sears' testimony:

"I was acquainted with Joseph L. Winn

during his lifetime. He came to my office in Portland on the 31st day of December, 1928, and I had him under observation for about six weeks. He first came to my office and then I sent him to the sanitarium. While at the office he had a physical examination and from there he went to the hospital and returned to the office every two or three days for subsequent tests. He left Portland about the middle of February, 1929.

"When Mr. Winn came into my office December 31, 1928, he was complaining of fatigue, lack of pep, insomnia, gas distress in his abdomen especially in the stomach, which he had had for five or six years. This partly came on when tired, at times when lying and at times several hours after meals. At that time I made an objective examination of his physical condition. He was given a complete physical examination from head to foot. * * *

"Mr. Winn did not tell me that he had been examined by or had consulted Dr. Blackford or Dr. Dowling, but he did advise me that he had been examined by doctors, without naming them, concerning the same trouble he was coming to me about. He stated that he had consulted several doctors; he didn't state just how many—that he had been diagnosed by one as gall bladder disease; by another as ulcers of the stomach and by another as something else, he didn't state; that he was coming to me for observation, in a sense, as a court of last resort, to let me decide what was the matter with him; that he was going to put himself under my observation and control for that purpose. * * * *"

The doctor gave a detailed account of the various examinations, tests, and findings. Continuing, he said:

"By this examination there were no conditions which indicated either chronic cholecystitis, peptic ulcers, pyloric ulcers or any other disability. The outline of the stomach and duodenum were sharp and clear. X-ray pictures were taken of the gall bladder with the Graham-Cole test, with the gall bladder filled and emptied, and there was no evidence of stones in the gall bladder."

And again:

"After seven weeks under my observation, I made a diagnosis of fatigue neurosis, which in other words is just a group of nervous phenomena, including nervous indigestion, which follows states of nervous tension and fatigue and slight hypertrophy of the heart. I did not find anything else wrong with him.

"I advised Mr. Winn when he left my care that he did not have any ulceration in his stomach or intestinal tract. There was no evidence that he had any disease of the gall bladder."

After expatiating at length on cholecystitis, gallstones, gall bladder troubles, the symptoms accompanying such complaints, the methods of diagnosis, including X-rays, Dr. Sears testified:

"Nervous dyspepsia may exactly simulate a condition of ulcers or gall bladder disease. * * *

"On the basis of such tests and findings, I made a diagnosis of nervous dyspepsia and stated that he did not have ulcers or gall bladder disease.

"Based upon my examination of Mr. Winn, I advised him that he did not need an operation.

"* * * Gas is a very common condition in people who are nervous, first because they swallow an excessive amount of air when they eat and drink, and secondly, because the movements of the stomach and intestines are ordinarily very sensitive, complex movements, and when any individual who runs down and becomes nervous develops an increased amount of gas in both stomach and intestines, and especially when he loses the elastic contraction of muscle tissue—when they lose that reserve nervous energy, these tissues let go and develop what we call edema or state of flabbiness, plus the influence of lack of fat in the abdomen, which he displayed."

On cross-examination he testified:

"The sanitarium I spoke of is one that our office sends all patients to. I do not know that it is known as being my sanitarium. It is known as the Portland Convalescent Hospital. There are four of us who take our patients there. Mr. Winn was referred to me by some friends in Seattle. He complained of fatigue, lack of pep and insomnia and had gas, extending back over five or six years, gas distress in the abdomen, and especially high up in the region of the stomach, which occurred especially when he was tired, and very commonly after lying down and after the use of coarse foods.

"He described the condition as distress. When I asked him as to actual pain, he described it as a sense of intense fullness, rather than acute pain. He developed spells in which he had great fear. * * *

"My diagnosis was fatigue-neurosis. That means essentially the same thing as

nervous dyspepsia, which is one of the outstanding phenomena of fatigue-neurosis. Nervous dyspepsia reacts on the part of the stomach and intestines to states of nervous and mental fatigue. It is caused by a nervous state, but it brings symptoms, pain and distress, just the same as if it were an organic disease, and many times it is even more serious than many cases of dyspepsia from an organic cause. It is not so serious in so far as it, in itself, never leads to death. I told Mr. Winn that he was suffering from nervous dyspepsia.

" * * * The symptoms such as I found in Mr. Winn are frequently and quite usually followed by exploratory operations, which I think is usual as a mechanism of covering up ignorance and incompetence. * * *

"There was no doubt in my mind about my diagnosis and I gave him positive assurance when he left the hospital. When he visited the hospital in October, 1930, he was apparently in good health. I gave him a thorough examination on that date and did not find any organic disease. He was apparently all cured at that time of this nervous dyspepsia and was free from gas. * * *

"I never use the word 'dyspepsia' to the patient, because to me it is a silly term, a cloak to cover up ignorance. The term 'nervous dyspepsia' is just a general term. I do not use the word 'dyspepsia' with patients in that sense, because it does not represent a definite, single picture or organic disease."

Upon the trial and at the conclusion of the testimony of plaintiff's witness Dr. Sears, defendant asked leave to amend its answer by setting up three further particulars of misrepresentation, namely: (1) Insured's denial that he had ever been in a hospital for medical treatment; (2) denial of attendance by Dr. Sears during the three years period; and (3) a denial that he had ever had dyspepsia. This request was denied by the court and exception was allowed. This is also assigned as error.

John E. Horton, the agent of the Prudential Insurance Company, appellant herein, who wrote the policies upon the life of Mr. Winn, then testified that he first approached the deceased concerning this insurance in February, 1930. At that time he was urging the deceased to take $50,000 of insurance. The insured, after considering it, finally said that $20,000 or $25,000 was his maximum, and he might not take that much.

The negotiations continued from February until the policies were finally issued in November, 1930.

Dr. Henby, appellant's medical examiner, testified that during that time he had seen the insured several times; that the agent had made several attempts to get Mr. Winn insured, and that he had seen Mr. Winn and filled out some papers, and later the agent returned stating that the deceased had not accepted the policy, or had been refused, and that the agent was trying to get this arranged so the insurance would be issued; that upon his examination he found the deceased had an apparent hypertrophy of the heart, which he reported, and there was a great deal of communication between the head office and the local office in regard to that; that he had examined the insured prior to the time of writing to Dr. Sears, and that in getting out a subsequent examination he gave a full history, as far as he knew it; that he had forwarded to the company a cardiograph taken by Dr. Von Phul as to the heart condition and an X-ray plate of Mr. Winn by Dr. Sears of Portland; that he examined deceased on these various occasions; that his condition and general physical appearance seemed good, and he thought he had so recorded it in his report.

The witness testified concerning the medical examination and the questionnaire which he had filled in for the applicant to sign, the original of which is in evidence.

In the original document these questions and answers, hereafter set out under numeral 6, appear on a printed page in a parallelogram about four inches wide and an inch and a half in height, and are divided into two columns. All the questions are in the first column, and the space left for answer is sufficient only for a single word. The blank space to the right, not very large, is left for brief elaboration. The questions and answers in the left-hand column are as follows:

"6. Have you ever

"a. Had a serious illness? Yes

"b. Received a severe injury? No

"c. Had a surgical operation? Yes

"d. Had medical or surgical treatment in a hospital or sanitarium? Yes

"If yes, medical or surgical? Surgical

"e. Do the answers to questions 6a, b, c, d, e and f constitute a complete statement of all of the severe illnesses, surgical operations and hospital or sanitarium treatments which you have ever had? No."

The right-hand column contains the following:

"f. Give full history (dates, nature of illnesses, time disabled, and results).

"(a) *Appendicitis—1904—disabled* **13** *days.*

"*Appendectomy performed.*

"(c) *Appendectomy 1904. Disabled 13 days.*

"(e) *Was in sanitarium in Portland in to rest after influenza.*"

The italicized portions were written in by Dr. A. E. Henby, examining physician of the appellant.

The doctor further testified, and the original exhibit shows, that by question 9 the insured was asked: "On what dates and for what complaints have you been attended by a physician during the past three years?" To which the insured states: "Dr. Turner, 1929, acute inflammation pharynx. Not disabled."

By the tenth question insured was asked: "Have you ever had"—after which in three columns appear some 30 separate diseases, the answers to two of which are claimed by appellant to have been false, to wit: "Dyspepsia?" "No." "Ulcers on any part of the body?" "No." Concerning this original medical report and the declarations of the insured, the company doctor further testified: "* * * The answers to the questions were written by myself. * * * At the time I wrote the answer to question No. 9, in Exhibit A-2, I knew that Mr. Winn had been down to Dr. Sears, in Portland. I didn't put the name of Dr. Sears down in connection with question No. 9 on the application for insurance and why I didn't I couldn't tell you. * * * I did not put in my report all the information that Mr. Winn gave me with reference to his visit to the Sears sanitarium. I remember that he stated that he was not under any special treatment that is not recorded here. In my report I recorded the total conclusions, not every question asked. I asked him many questions, but I have recorded what seemed to me the conclusion as to the whole matter."

After the application for insurance and the medical report had been sent in to the head office of appellant, Dr. Joseph E. Pollard, associate medical director of appellant, whose duty it was to review these applications and reports and finally pass upon them, came to Seattle before the policies were issued. He testified that while there he called on the insured with appellant's Seattle manager and agent Horton and talked with him about his health; that the insured made no mention that he had been under treatment for peptic ulcers, gall bladder trouble, or any other digestive trouble prior to the time he saw him. Insured told him that he had had an attack of influenza in December, 1928, and had gone to a sanitarium in Portland for rest, and had there been seen by Dr. Sears of Portland.

Dr. Pollard testified that he had afterwards gone to Portland and had a talk with Dr. Sears; that he there saw an X-ray of applicant's heart; that the only question raised was concerning the hypertrophy of the heart; and that it was on account of this heart trouble that the decedent had been offered a policy with a special "A" rating.

The doctor testified that in approving the application he relied upon the answers and declarations made to the medical examiner. As to what occurred between the date of the application, June 27, 1930, and November 6, 1930, when it reached him, he could only give the hypothetical answer that the lapse of time may be accounted for by some correspondence in the home office. There may have been some investigation during that period. That although the application said nothing about it, he did know that the applicant had been treated by Dr. Sears in 1928.

After the death of the insured a post mortem was held and it was testified over objection by Dr. D. H. Nickson, who made the post-mortem examination, that the death of Mr. Winn was not due in any way to either peptic ulcer or pyloric ulcer or a chronic cholecystitis. Also, over objection, this witness testified that in his opinion the condition which he found at the post mortem was an acute condition which did not exist for any period of time, such as six months or a year prior to the death of the insured. Also over the objection of appellant Dr. Sears testified that in his opinion death from the causes stated as the result of the post mortem had no relation to any condition which he found when he examined Mr. Winn.

Letters from the decedent to Dr. Sears and one from Dr. Sears to Dr. Henby, which appellant claims indicate an intent on the part of the deceased to deceive the company, were also introduced in evidence. These letters are too long to be placed in the record, but it will suffice to say that the claim of fraud, which would necessarily implicate Dr. Sears in a collusion to deceive the company, rests upon the distorted construction of a single clause in a sentence, which whole paragraphs contradict.

At the close of all the testimony the appellant moved that the court instruct the jury to return a verdict in its favor, which motion was overruled and exception allowed. The jury was thereupon instructed, and after deliberation returned a verdict in favor of the appellee upon which the court duly entered its judgment, from which the defendant has appealed to this court.

The law as applied in the state of Washington governs in this case. Remington's Compiled Statutes of the State of Washington, § 7078, reads as follows: "No oral or written misrepresentation or warranty made in the negotiation of a contract or policy of insurance, by the assured or in his behalf, shall be deemed material or defeat or avoid the policy or prevent it attaching, unless such misrepresentation or warranty is made with the intent to deceive. If any breach of a warranty or condition in any contract or policy of insurance shall occur prior to a loss under such policy, such breach shall not avoid the policy nor avail the insurer to avoid liability, unless such breach shall exist at the time of such loss under such contract or policy."

Under this statute no misrepresentation is material or will defeat the policy unless it is made with an intent to deceive. Whether the answers to the questions were false, and, if so, whether they were made with intent to deceive, were matters of fact.

The differences between the parties arise principally concerning the conclusions to be drawn from the facts in evidence, the law of the case depending almost altogether upon the interpretation placed on the facts for its application.

The appellant concedes that it has the burden to establish intent to deceive by clear and convincing evidence. It relies upon the answers given to the questions made part of the medical report, but the evidence shows that these questions were not written down by the decedent but by the medical examiner for appellant, and do not contain all the information given by decedent but are the medical examiner's own conclusions. In his testimony he said: "In my report I recorded the total conclusions, not every question asked. I asked him many questions and I have reported what seems to me the conclusion as to the whole matter." The scope of some of the questions asked, the truthfulness and good faith of the answers, for proper understanding depended upon the circumstances surrounding the insured and the medical examiner at the time the statements were made together with the other facts bearing upon the

issues, all of which were proper for the determination of the jury, and the District Court committed no error in submitting the case to the jury.

The appellant in its brief argues strenuously that it appeared from the undisputed evidence that misrepresentations as to material matters were knowingly made, and therefore it will be presumed as a matter of law that they were made with intent to deceive, and in support of this proposition cites an extended list of authorities, beginning with Mutual Life Ins. Co. v. Hilton-Green, 241 U. S. 613, 36 S. Ct. 676, 60 L. Ed. 1202, and culminating with Mutual Life Ins. Co. v. Campbell, 170 Wash. 485, 16 P.(2d) 836. In none of these cases were the facts just like the case at bar. Under all the testimony in this case the jury was warranted in reaching the conclusion that even if the answers to questions were not correct, the evidence indicates that there was no intent to deceive.

Judge Wilbur, in the case of Great Northern Ry. Co. v. Shellenbarger, 54 F.(2d) 606, 607, speaking for this court said: "* * * after verdict, of course, all the evidence and inferences properly deducible therefrom tending to support the verdict must be indulged by the appellate court. * * *"

The appellant was required to establish its charge of misrepresentation or intent to deceive by clear and convincing evidence. Day v. St. Paul Fire & Marine Insurance Company, 111 Wash. 49, 54, 189 P. 95.

The answers given to questions in the application for insurance should receive a liberal interpretation in favor of the insured. This was stated by Judge Rudkin in delivering the opinion of this court in the case of Bankers' Life Co. v. Hollister, 33 F.(2d) 72, 74: "* * * Furthermore, the application must be liberally construed in favor of the insured, and, under the weight of authority, an applicant for insurance is not required or expected to disclose the fact of employing or consulting physicians or surgeons for slight and temporary ailments which leave no trace of injury to health, such as an ordinary cold or inability to sleep because of occasional excesses, such as existed in this case. 37 C. J. 464."

As stated, the declarations, relied upon as misrepresentations made with intent to deceive, are the answers to certain questions alleged to have been made to the medical examiner and by him entered upon the questionnaire. Dependence is placed upon the following: "Have you ever had a serious ill-

ness?" "Appendicitis, 1904, disabled 13 days, appendectomy performed." Appellant insists that the decedent falsified in giving the impression that the only serious illness that he had ever had was appendicitis in 1904. Appellant contended that the insured in fact had been and was seriously ill with cholecystitis (gall bladder disease) and peptic or pyloric ulcers. To establish this contention it apparently relies upon the testimony of Drs. Blackford and Dowling, and while differing in their separate diagnoses, each indicated that decedent when he visited the Virginia Mason Clinic at the time they saw him was suffering from one or the other of these illnesses. The testimony of Dr. Sears is to the contrary, and so also the testimony of the doctor who performed the surgical operation from which the decedent did not recover, and the doctor who made the post mortem examination. The conclusion on this point from the evidence of these doctors was that decedent had not been so afflicted at the time of the issuance of the policy.

█ It is urged that the court erred in permitting appellee to introduce this testimony of medical experts tending to show that the death of the insured was not due to chronic cholecystitis, nor peptic or pyloric ulcers, and further tending to prove that the acute ulcerative colitis, which was the immediate cause of death, could not have existed for more than a short period before death. As the amended answer pleaded as a matter of defense that these disorders existed and were fraudulently concealed by deceased at the time of his application, and the testimony of Drs. Blackford and Dowling, appellant's witnesses, implied the existence of such diseases, and the report of the post mortem examination having been put in evidence by appellant, and Dr. Pollard, the company's physician, having theretofore testified that "if the application of the insured had disclosed a condition of peptic ulcer and chronic colitis I would have rejected the application," the admission of the testimony complained of was not error.

Concerning the claim that the insured with deliberate intent deceived appellant by stating that he had been in a sanitarium instead of a hospital and that he had never had dyspepsia, Dr. Sears, who, with the knowledge of the appellant, treated the deceased at this institution, referred to it as a sanitarium, but said that it was also known as the Portland Convalescent Hospital. As Dr. Pollard, the principal medical officer of appellant, who has the final word on the application, visited Dr. Sears before the policies were is-

sued, the contention that the company was deceived is without merit. The same may be said with reference to the claim that the questionnaire, in stating that applicant had not had dyspepsia, was a misrepresentation with intent to deceive. As the record indicates, this contention is based entirely upon the testimony of Dr. Sears, who, in referring to the condition of the applicant at the time he came to him for treatment, said: "My diagnosis was fatigue neurosis, that means essentially the same thing as nervous dyspepsia, which is one of the outstanding phenomena of fatigue neurosis." The doctor then expatiated at length on this nervous state, at the conclusion of which he intimated that he had told Mr. Winn that he was suffering from nervous dyspepsia. Later, at the conclusion of this testimony, this matter is called specifically to his attention and he says: "I never use the word 'dyspepsia' to the patient, because to me it is a silly term—a cloak to cover up ignorance. The term 'nervous dyspepsia' is just a general term. I do not use the word 'dyspepsia' with patients in that sense, because it does not represent a definite single picture or organic disease." This is all there is in the record upon which to base the contention that the answer of the applicant was untrue and made with an intent to deceive.

██ Whether the answer on the medical examiner's report to the effect that decedent had not been "attended" by a physician, other than Dr. Turner, during the past three years prior to his application, was a deliberate attempt to deceive, we hold was a question of fact for the jury under proper instructions of the court, and the court in amending the instruction requested by appellant upon this point did not commit error. The modification complained of was in excluding from consideration any attendance by a physician for any complaint which was "slight and temporary in its nature."

The evidence shows that the decedent on his visits to the clinic complained of trouble with his stomach. Dr. Blackford's testimony was: "That under the X-ray the outline of the stomach and upper part of the intestines was normal, and we could not make an objective diagnosis of ulcer of the stomach or duodenum."

Dr. Dowling testified with like effect: "* * * The cholecystogram test showed a normal function of the gall bladder. X-ray showed normal outline of the stomach and duodenum. From the objective tests, I was unable to give a definite opinion of chol-

ecystitis. No diagnosis was ever made or offered to Mr. Winn that was anything more than a tentative diagnosis as a working basis for advice and treatment. * * * "

The scientific instruments of precision, as the doctors testified, negatived the diagnosis of the physicians. Of this fact the insured was informed. He took no treatments from the physicians at the Virginia Mason Clinic. The evidence further discloses that Dr. Sears at a later time convinced the applicant that his disorders were temporary and not serious. In the light of this testimony the court's instruction was correct. Houston v. New York Life Ins. Co., 166 Wash. 611, 8 P.(2d) 434; Askey v. New York Life Ins. Co., 102 Wash. 27, 172 P. 887, L. R. A. 1918F, 267.

▇▇ Further, the fact that appellant's examining physician knew that the decedent had been consulting with or treated by Dr. Sears, and had been X-rayed by Dr. Von Phul, neither of whose names appear in the answers as written by the medical examiner, which must have been revealed by the decedent, tends to establish his good faith in the matter and was proper for the jury to consider in passing upon the good faith of the answers. It might also indicate that appellant's examining physician did not regard visits to clinics or being X-rayed as being "attended by a physician."

It has been held that a statement that insured had not been "attended" by a physician will not defeat the policy, although the evidence shows that he had "consulted" a physician. . 37 C. J. 465, § 179; De Fazio v. Metropolitan Life Insurance Co., 129 Misc. 821, 222 N. Y. S. 60; Byers v. Pacific Mutual Life Insurance Co., 133 Cal. App. 632, 24 P. (2d) 829; Brigham v. Mutual Life Insurance Co., 95 Wash. 196, 163 P. 380; Sovereign Camp, W. O. W., v. Brown, 94 Okl. 277, 221 P. 1017; Wharton v. Aetna Life Ins. Co. (C. C. A.) 48 F.(2d) 37, 43.

While we have passed upon the merits of the instruction as given, it might be well to note that the exception to the court's definition of the word "attended" is too general. State Life Insurance Co. v. Sullivan, 58 F. (2d) 741 (C. C. A. 9).

▇▇ It was within the court's discretion to refuse to permit appellant to amend its amended answer at the time of the trial, and as appellant has failed to show that the court abused its discretion in that regard, no error can be predicated thereon.

Counsel for both sides with notable industry have cited and extensively quoted from far too many decisions for us to separately comment upon. The distinction in the cases is largely, if not altogether, in the difference of the facts, as illustrated in the case of Zogg v. Bankers' Life Co. of Des Moines, Iowa (C. C. A.) 62 F.(2d) 575, cited by appellant.

Attention is called to the case of Adler v. New York Life Insurance Company (C. C. A.) 33 F.(2d) 827, 831, cited by appellant to show how widely the facts in some of these cases relied upon to support appellant's contention here, differ from the case at bar. In the Adler Case the applicant was a life insurance agent who made applications for five insurance policies on November 14, 1924. To all questions concerning whether he had consulted a physician with reference to a number of diseases he answered, "No," with the exception that he had been treated for a slight deafness, giving the name of the physician. In answer to a later question: "What physician or physicians, if any, not named above, have you consulted or been examined or treated by within the past five years?" To which the answer was, "None." As the court in its opinion found the proof showed that from March 11, 1922: " * * * up to the date of the applications, Perrin (the insured) had received 111 such treatments (for chronic prostatitis and seminal vesiculitis), of which 32 were in 1922, 8 in 1923, and 71 in 1924 (up to the date of the applications, November 14, 1924). * * * " This was a suit in equity, and the Circuit Court of Appeals upheld the District Court in cancelling the policy.

Another distinction arises from a varying interpretation of the law as given in different jurisdictions. Thus, appellant cites in its brief the case of Germania Life Ins. Co. v. Klein, 25 Colo. App. 326, 137 P. 73, six different times, and the case of Lewis v. New York Life Insurance Co., 201 Mo. App. 48, 209 S. W. 625, eleven times. In both of these cases the policy of insurance was a Colorado contract. In Colorado the courts hold that where statements in an application for life insurance are false, and material to the risk on which the policy is based, the false statements avoid the policy whether the representations were the result of intention or of mistake, or whether made in good faith or not.

In the state of Washington, which law governs the contract of insurance here · in question, both the statute and decisions require that the false statements must be made with intent to deceive. From the state of Washington appellant cites Day v. St. Paul Fire & Marine Ins. Co., 111 Wash. 49, 189

P. 95, 96, which involved a policy of insurance on an automobile. In that case the insurance was obtained upon the representation: "That the automobile was manufactured in the year 1911, and that when purchased by respondent in October, 1911, was new and had cost respondent $3,400, whereas, in fact, the automobile was a 1910 model, and when purchased by respondent was a secondhand car and had cost her $2,000, $800 paid in cash and $1,200 in trade * * *." The applicant for the insurance admitted that the representations were made with knowledge that they were untrue. The Supreme Court of Washington held that the evidence was sufficient as a matter of law to show that the misrepresentations were made with intent to deceive.

In the case of Quinn v. Mutual Life Ins. Co., 91 Wash. 543, 158 P. 82, the applicant for a life insurance policy, as an inducement to its issuance, stated in his application that he had had no diseases since childhood; that he was in good health and had not consulted a physician in the last five years, when, in fact, he was suffering from syphilis and had received medical treatment therefor from a physician less than a month prior to the date of his application for a policy. The lower court found that these representations were made by the applicant without intent to deceive, within the meaning of the statute of the state of Washington heretofore quoted. That case was tried without a jury. Upon appeal the Supreme Court reviewed the facts and determined that the representations could not have been made without an intent to deceive, and therefore canceled the policy. It will be noted that the Quinn Case was tried without a jury, and under the laws of the state of Washington, the Supreme Court reviews the facts as on a trial de novo. Ballinger's Code, § 6520; Allen v. Swerdfiger, 14 Wash. 461, 44 P. 894.

In the case of Brigham v. Mutual Life Insurance Co., 95 Wash. 196, 163 P. 380, 381, the court, commenting on its previous decision in the Quinn Case, said:

"* * * We found both a misrepresentation and the intent to deceive from the facts, the record disclosing that at the time he made his application Quinn was affected with syphilis and was taking treatment therefor. * * * The facts in this case would not support such a finding. The difference in the facts makes the difference in the law. We did not intend to hold in the Quinn Case that misrepresentation alone was sufficient, as that would be flying into the teeth of the statute which was referred to in the opinion, followed by this observation:

"'In view of this statute, the only fact to be determined is whether or not the representations made by the applicant were made, as the court found, without intent to deceive.'

"This language can mean nothing else than that the intent to deceive must be found as a fact. This can be the only interpretation of the statute, and if it be assumed that the Quinn Case establishes a contrary rule, it is now departed from."

In commenting on the Quinn Case in Day v. St. Paul Fire & Marine Insurance Co., supra, the court further said: "* * * The Quinn Case, even though it had not thereafter been questioned by this court, would hardly support the contention that appellant makes that all material false representations made by an applicant would relieve an insurance company, for that would nullify the provision that such representations should not have that effect if they were not made with intent to deceive. The result in the Quinn Case was correct for the reason that it was a case tried without a jury and the court determined the fact to be that there was an intent to deceive, at the time the representations were made."

Further, in the case of Brigham v. Mutual Life Insurance Company, supra, where the applicant had made representations similar to those in the Quinn Case, the Supreme Court of Washington held that the question of whether those representations had been made with intent to deceive was a question of fact which should have been submitted to the jury. Ordinarily, the intent to deceive in misrepresenting past illnesses is a question for the jury. Askey v. New York Life Insurance Co., supra.

Judgment affirmed.