## MUTUAL LIFE INS. CO. OF NEW YORK v. SCHAFER et ux.

### No. 425.

District Court, W. D. Washington, S. D.
Aug. 21, 1943.

Evans, McLaren & Lane, of Seattle, Wash., for plaintiff.

Lenihan & Ivers, of Seattle, Wash., for defendants.

LEAVY, District Judge.

This is an action brought by the plaintiff against the defendants to cancel and set aside a policy of life insurance upon the ground that it was fraudulently obtained, and that it never became effective because the insured was not in good health when it was delivered.

A chronological statement of the facts discloses that the plaintiff's representative, M. A. Tenney, who, for many years, had been engaged in the business of soliciting insurance for it, went from Seattle, Washington, to Montesano, Washington, where the defendant resided, and was actively engaged in the logging and lumber business on an extensive scale, and solicited the defendant to make an application for additional insurance with his company. At first, the defendant declined to make such application. He stated that he desired no additional insurance; however, after solicitations running over a period of two days, he signed a written application, and on the evening of December 20, 1941, submitted himself to plaintiff's medical examiner, Dr. Frank O'Brien, at Montesano, Washington, where he was given the usual medical examination for life insurance. This examination on its face indicates that it was concluded at 5 p. m. on that day. The application was for a $10,000 "preferred risk" policy. The application was on a form prepared by the plaintiff, and all of the entries in the medical examination were in the handwriting of plaintiff's medical examiner, excepting the signature of the defendant.

It is the contention of the plaintiff in this action that the defendant, John D. Schafer, falsely and fraudulently made answer to certain of the questions for the

purpose of deceiving the plaintiff and obtaining the insurance herein.

The specific questions and answers in the medical examination that the plaintiff contends were false, are the following:

examine the defendant for blood pressure and weight. This was done on January 26, 1942, and the blood pressure indicated was 140/82, and the weight 190 pounds. Upon the receipt of this supplemental informa-

"22. State every physician or practitioner whom you have consulted for any purpose in the past five years.

| Name of Physician or practitioner | Address | Date | Nature of Complaint— purpose of consultation (include Health Examinations) |
|---|---|---|---|
| None except Dr. Leede | Seattle, Wash. | 1941 | For routine examination |

"23. Have you given complete answers to questions 21 and 22?     Yes.

"24. Are you in good health?     Yes.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"32. Has change of residence or occupation on account of your health ever been made or advised?     No.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"35. Have you modified your diet in past year?     No.

| "36. Have you ever had: | Yes or No | If answered 'Yes' give dates and full details. |
|---|---|---|
| (a) An electrocardiogram, x-ray blood examination or other special laboratory test? | Yes | Routine checkup only by Dr. Leede, Seattle. |
| (b) Rheumatism, diabetes, syphilis? | No. | |
| (c) Mental trouble, fainting spells, paralysis? | No. | |
| (d) Tuberculosis, spitting or vomiting blood? | No. | |
| (e) Heart trouble, pain or pressure around heart, abnormal blood pressure? | No. | |
| (f) Stomach or gallbladder trouble, gallstones, acute indigestion? | No. | |
| (g) Kidney trouble or stones, disturbance of urination, prostatic trouble? | No. | |
| (h) Cancer, tumor or ulcer? | No. | |
| (i) Eye or ear trouble or impairment? | Yes | Totally deaf in left ear since 1925". |

The medical examination revealed that the defendant had a blood pressure of 146/86, and the weight of the defendant was given at 180 pounds.

On December 24, 1941, this application reached the company offices in New York. Upon an examination of the application, it was requested that the local examiner re-

tion by the medical department of the plaintiff company in New York, an endorsement was made as follows: "Policy will be held for further instructions, Jan. 28, 1942, Medical Referee", and then, without date, further endorsement: "Medical Department, requirements satisfied. E. M. R." (Plaintiff's Exhibit 2 A, B, C.)

Thereafter, the application was approved for a $10,000 "life at 85" policy, but declined as an application for a $10,000 "preferred risk" policy, and it was issued.

As soon as the policy could be forwarded to the Seattle representative of the plaintiff company, it was taken by the company's solicitor, M. A. Tenney, to Montesano, Washington, on February 14, 1942, and tendered to the defendant, John D. Schafer. Schafer declined to accept the policy as it was not in conformity with his application; however, after considerable discussion, he agreed to accept a policy of the same type for $5,000, and thereupon paid the solicitor the annual premium in the sum of $223.80, and agreed that the new policy, when issued for $5,000, could be dated back to November 8, 1941, and further that the initial application made for insurance should be construed as an application for this policy.

Before the plaintiff issued the policy in question, it made a request on February 19, 1942, for a statement from Dr. Leede, the personal physician of the defendant, and whose name and address had been furnished by the defendant in response to the information sought in his medical examination. However, without awaiting a reply from Dr. Leede, the plaintiff company, within five days after seeking information from the defendant's physician, directed the issuance of and did issue the policy of insurance involved in this action.

After the issuance of the policy, it was forwarded to the plaintiff's representatives in Seattle, Washington, for delivery to the defendant. The policy was not delivered, however, until the 14th day of March, 1942, and two days preceding this date; that is, March 12, 1942, Dr. Leede had made his report to the plaintiff, giving in detail the result of his professional observation and treatment of the defendant. Ample time and opportunity existed to permit the plaintiff to withhold the delivery of the policy following the report of Dr. Leede.

On March 16, 1942, defendant became ill, and Dr. O'Brien, who was the company's examiner, was called. He found the defendant suffering from what appeared to be the after effects of a slight cerebral hemorrhage, and found his blood pressure to be 194/110. On March 18, Dr. O'Brien was discharged from the case, and Dr. Max W. Brachvogel was called, and after examination of the defendant, he ordered him removed to the hospital at Aberdeen, and diagnosed his trouble as the "residual symptoms of a small cerebral hemorrhage, or a low grade infection which hit the particular center controlling the tongue." He also found the patient extremely nervous and agitated. His blood pressure was 152/90, and the doctor removed a pint of blood from his veins and gave him sedatives. He was kept quiet in the hospital for two or three days, and then discharged as an ambulatory patient, and permitted to go to his home.

Following his discharge from the hospital, the defendant Schafer, in company with his wife, went to a summer home on Hood's Canal, where he remained quiet for several weeks, and thereafter soon resumed his former occupation—managing and supervising an extensive logging and milling operation, and has continuously and uninterruptedly followed it since.

The defendant's blood pressure, according to Dr. Brachvogel, on March 20, 1943, was 148/88, and on May 10, 1943, twenty days before the trial, it was 160/98.

The plaintiff instituted this action to cancel the contract of insurance on the 20th day of July, 1942, and prior thereto, on the 23d day of May, 1942, plaintiff made written demand for a return of the policy and tendered the premium paid thereon, together with interest.

It is earnestly contended by the plaintiff, and numerous authorities are cited to support its contention, that the policy should be avoided, since it was issued by the plaintiff in reliance upon the representations contained in the application, and upon the further ground that the policy was not delivered to the defendant during his "continuance in good health".

■ At the conclusion of the trial, the court announced that the evidence was insufficient to establish the fact that any of the answers made by the defendant in the application were made with an actual intent to deceive, and the court so finds at this time.

■ The contract of insurance involved herein is governed by the laws of the State of Washington. The legislative policy of the State unequivocally provides that a policy of insurance can not be avoided or canceled except upon express proof of willful fraud or misrepresentation, and unless such misrepresentation is made with an intent to deceive. Rem.Rev.Stat.Wash. § 7078.

924

.Statutory law of the State further provides, in substance, that the falsity of any statement in the application for a policy of insurance against loss from death of the insured shall not bar the right of recovery, unless such statement was made with actual intent to deceive, or unless it materially affected either the acceptance of the risk or the hazard assumed. Sec. 7238, Rem.Rev.Stat. of Wash.

These statutes have been repeatedly construed by the Supreme Court of the State. Construction of these statutes on facts somewhat similar to those in this case are: Houston v. New York Life Ins. Co., 166 Wash. 611, 8 P.2d 434; Kearney v. Washington Nat. Ins. Co., 184 Wash. 579, 52 P.2d 903, and the cases therein cited.

It is true that there are numerous decisions which hold that these statutes do not imply that an applicant for insurance may make willful and intentional false and fraudulent statements in his application concerning material matters, and have the insurer rely thereon, and issue a policy of insurance, but such is not the situation in the instant case. Here the court expressly finds that there was no intent to deceive or defraud, and, further, that the insurance company did not accept and rely alone upon the initial medical examination.

A case that was appealed from this court to the 9th Circuit Court of Appeals that presents a set of facts in many respects similar to those involved in this case, is Prudential Ins. Co. v. Winn, 9 Cir., 71 F.2d 126. In a very able and carefully considered opinion, after a comprehensive statement as to the facts in the case, Judge Garrecht, writing the opinion, lays down the rule of interpretation that should be applied in construing Section 7078, Rem. Comp.Statutes. This decision cites numerous authorities from the Supreme Court of the State of Washington, giving construction and application to Section 7078, and in view of the close similarity between the facts in the Winn case and the facts as I find them in this case, I can entirely rest my decision as to the law upon that announced in the Winn case.

Further examining the facts in this case, it can not be contended that the proof sustained the allegation that the answers to questions numbered 21, 22, 23, 24, 32 and 35, were false, fraudulent, and made with an intent to deceive, since the defendant truthfully stated the illnesses, injuries, diseases and operations since childhood. He gave the name of the only physician with whom he had consulted within the five years next preceding the making of the application. He stated his purpose in consulting the physician was for "routine examination", and such it was. He answered that he was in good health, and the very fact that he was carrying on the most exacting and strenuous daily labor, requiring from fourteen to sixteen hours per day of his time, indicates that he was in good physical condition; he answered that he had made no change of residence or occupation on account of his health, nor been advised to do so. This was true, with the possible exception of Dr. Leede's advice that he must "relax". He answered that he had not modified his diet, and he so testified that at the time of trial, stating that he had not followed Dr. Leede's suggestions in that regard. In answer to question No. 36, which has 9 subdivisions, he answered affirmatively to the question in regard to having an electrocardiogram X-ray, blood examination or other laboratory test, and his answers to all of the other subdivisions of this question are admitted to be truthful with the exception of subdivision (e), which asks:

"Have you ever had:
\*　　\*　　\*　　\*　　\*
(e)　Heart trouble, pain or pressure around heart, abnormal blood pressure?"

This question was answered in the negative. No other truthful answer could have been categorically given to the question in the manner in which it was framed. The answer to the first two parts of this question deals with a fact, while the answer to the third part of the question, relating to abnormal blood pressure, deals with an opinion. The defendant gave as his opinion that he had not had "abnormal blood pressure". An expression of an opinion or belief can not be made the basis for canceling a policy of insurance, even though it is not true. 29 Am.Jur. 425; 37 C.J. 457.

It is evident that the defendant, Schafer, personally did not consider himself suffering with abnormal blood pressure to a degree where it affected his well-being, otherwise he would not have continued the strenuous work that he was doing.

It is true that the evidence in this case discloses a wide variance of blood pressure, ranging as high as 194/110, maximum, down to 140/82, minimum. Both the layman and the expert might conclude this is

evidence of an organic ailment or impairment. However, this unusual blood pressure is accounted for in Dr. Leede's testimony, as well as that of Dr. Brachvogel. Both physicians testified there is no organic impairment, and Dr. Leede attributed this wide range of blood pressure to the fact that the defendant, Schafer, was a man having a "very, very high strung nature, tense man, with a neuro-vascular hypertension", and then he further defined this as a case where the nervous system controlling the width of the capillaries and the blood vessels is under such strain that the capillaries contract, and blood pressure rapidly goes up, and that when such persons lead a quiet life they can reduce their blood pressure fairly easily, and then he further said that the defendant had no evidence of Bright's disease, arteriosclerosis, nor metal poisoning, all of which are organic ailments known to cause high blood pressure.

The evidence indicates further, that from 1929 until 1940, the defendant went about his business without any illnesses whatever, and without the need of consulting any physician, and then in 1940, when he happened to be in Seattle on business, he called upon the old-time family physician, Dr. Leede, for what he termed as a "routine check-up", and at that time he was suffering somewhat from headaches. He was advised as to his diet and relaxation in his work, but he did not follow the advice and continued to work harder than ever, as the demands of his business grew due to the nation's war program.

It is the undisputed evidence in this case that the defendant at no time up to the date of the trial was suffering from any constitutional ailment, and Dr. Brachvogel, testifying by deposition under date of May 28, 1943, testified that the illness the defendant suffered on March 16, which kept him off his feet for a period of five days, three of which were spent in the hospital at Aberdeen, in his opinion, was the residual effects of either a small cerebral hemorrhage or a low grade infection, and that at the time the doctor gave his evidence it was his opinion that the defendant was not suffering from "any disease or impairment of any organ of his body."

■ In view of the foregoing evidence and the observation of the defendant by the court, when he personally appeared to testify in this cause, and the further fact that he was continuing to carry on the ex-

ceedingly arduous duties in connection with his business, I must find that the defendant is now and was at all times herein involved, with the exception of a short period of time in 1942, a man in good health, and this, of course, would include the 14th day of March, 1942, when the policy of insurance was delivered to him.

The facts, as established by the evidence in this case, show that the plaintiff did not rely upon the answers made by the defendant in his written application for insurance. On the contrary, the plaintiff immediately questioned the matter of "abnormal blood pressure", and a month after the first report on the defendant's blood pressure had been made, it caused a second reading of his blood pressure to be taken. The evidence further discloses that the plaintiff, upon such report, saw fit to issue and tender to the defendant a policy of insurance for $10,000, but not a "preferred risk" policy. The evidence further indicated that the plaintiff carried on an independent investigation of its own as to the fitness of the defendant for a policy of life insurance with it, by having its representative investigate the defendant's reputation, character and health in the community where he resided. The evidence further discloses that the plaintiff, as early as February 19, 1942, requested a statement from Dr. Leede as to his knowledge of the physical condition of the defendant, which knowledge he had gained in the capacity of being the private physician of defendant. The evidence further discloses that without waiting for the report of Dr. Leede, the plaintiff directed the issuance of a policy. However, two days before its delivery to the defendant, plaintiff was in possession of the facts it relies upon in this action to avoid the policy, because it then had Dr. Leede's report, and yet it saw fit to deliver the policy to the defendant two days after receiving this report.

■ These facts clearly negative the statement that the plaintiff relied exclusively upon the medical examiner's report in this case. Instead, it issued and delivered the policy after a lapse of almost three months from the date of the initial application and during a period of time when every opportunity existed to ascertain all material facts concerning the defendant's physical well-being.

I have refrained from citing authorities extensively, but I have carefully considered all of those submitted by counsel for the

plaintiff and for the defendant, and have examined numerous additional authorities.

The foregoing is my finding on the facts, and as a conclusion therefrom, the action of the plaintiff will be dismissed. If either or both parties desire more formal findings, such may, upon notice, be presented to the court; if not, a decree dismissing the action, upon notice, may be submitted.